## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**DERRANCE HARRIS, on behalf of himself
and others similarly situated,**                                    **PLAINTIFF**

**VS.**                                  **NO. 4:25-cv-00268-DPM**

**EXTO, INC. d/b/a ATLAS**                                    **DEFENDANT**

### ATLAS' MEMORANDUM IN SUPPORT OF ITS MOTION TO STAY AND COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS UNDER RULE 12(b)(6)

## I.    INTRODUCTION

Plaintiff Derrance Larvle Harris alleges that he received text messages from Atlas without his consent, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c). His claims clearly fall within the scope of the applicable arbitration clause in Atlas' Terms of Service ("Terms"), which Plaintiff explicitly agreed to on August 10, 2024.

Atlas respectfully seeks an order staying this case and requiring Plaintiff to arbitrate his claims pursuant to the arbitration provision (the "Arbitration Agreement") in Atlas' Terms. The Arbitration Agreement broadly encompasses any claim, dispute or controversy relating to the Terms or *any advertising*. The Arbitration Agreement also provides that all issues are for the arbitrator to decide, including issues relating to its scope and enforceability, and the arbitrability of any particular claim under it. While the Arbitration Agreement makes clear that its scope is to be decided by the arbitrator, Plaintiff's TCPA claims against Atlas are plainly

within the Arbitration Agreement's broad scope. By the express terms of the Arbitration Agreement, this controversy must be resolved in arbitration rather than in court.

Under the Federal Arbitration Act ("FAA"), agreements to arbitrate are presumed to be valid and enforceable according to their terms. The Arbitration Agreement here, must be enforced as written. Thus, Atlas respectfully requests that the Court enter an order directing Plaintiff to arbitrate his claims on an individual basis pursuant to the terms of the Arbitration Agreement and staying this action until arbitration is complete.

If not sent to arbitration, Plaintiff's Complaint against Atlas, ECF No. 1, should be dismissed with prejudice. Plaintiff's TCPA claims should be dismissed because Subsection 227(c)(5) provides a private right of action only for certain types of sales calls, not text messages.  Contrary to Plaintiff's claim, the Supreme Court has not held that text messages are "calls," and the Federal Communications Commission's ("FCC") Congressional authority to extend its DNC Registry-related rules to texts expired decades ago.  Thus, the FCC's unauthorized, 2024 expansion of the term "calls" to include texts did not create a valid private right of action for any of Plaintiff's claims.

## II.    FACTUAL BACKGROUND

### A.  Plaintiff's Agreement to Atlas' Terms and the Arbitration Agreement

"Atlas is a financial technology company whose" offerings include "a consumer credit card." *See* Declaration of Noah Payton ¶ 3. In August of 2024, Atlas advertised

on the Internet, online social media platforms, and mobile apps, including Facebook, Instagram, and TikTok. *Id.* ¶¶ 4, 7.b.  A consumer would be brought to Atlas' website if he or she engaged with an Atlas advertisement on one of those platforms. *Id.* ¶ 7.b.

On August 10, 2024, Plaintiff engaged with an Atlas advertisement on a social media site and was brought to Atlas' website. *Id.* ¶ 8.a. There, Plaintiff was presented with an opt-in screen where he entered his telephone number ((501) 658-XXXX) and then clicked "Get Card," thereby agreeing to "receive account and marketing messages at the entered number." *Id.* ¶¶ 7.c, 8.a. When not blocked by device settings or other intermediate providers in the Internet chain, Atlas' opt-in process captures the city or other geographic region associated with the IP address of the device used by the consumer to consent to receive marketing messages from Atlas. *Id.* ¶ 8.b. Here, Atlas' records reflect that Plaintiff's opt-in happened from a device using an IP address associated with Little Rock, Arkansas, *id.*, which is within the Eastern District of Arkansas, where Plaintiff claims to live. *See* Compl. ¶ 5 ("Plaintiff is an individual located in this District.").

After that, Plaintiff completed Atlas' online account-creation process, *see* Payton Decl. ¶ 8.c-f, during which he provided the following personal information to Atlas:

- His name. *Id.* ¶ 8.c.i.

- His email address: cozplugn@gmail.com. *Id.* ¶ 8.c.ii.

- His telephone number, *again*. *Id.* ¶ 8.c.iii. Plaintiff also once again consented to receive SMS (text messages) from Atlas. *Id.* ¶ 7.f.v.

- He confirmed his email address and telephone number "look[ed] correct." *Id.* ¶ 8.c.iv.

- His date of birth: XX/XX/1976. *Id.* ¶ 8.c.v.

- His state of residence: AR. *Id.* ¶ 8.c.vi.

Plaintiff was then brought to a final screen titled "Accept terms & conditions." *Id.* ¶¶ 7.f.xi, 8.d. That screen, shown below, provided Plaintiff with three boxes he could check. *Id.* ¶ 7.f.xi.



Plaintiff checked the first box, through which he agreed to Atlas' Terms, which was the first blue-hyperlinked document in the sentence that begins "By clicking this box you agree to our Terms…" *Id.* ¶¶ 7.f.xi, 8.d.  Plaintiff also checked the second box, through which he agreed to Atlas' payment partner's Terms of Service. *Id.* ¶¶ 7.f.xi, 8.d. Plaintiff also checked the third box, such that, for a third time, he re-confirmed his consent to receive SMS (text messages) from Atlas. *Id.* ¶¶ 7.f.xi, 8.d. Plaintiff did not have to check the third box to click the "Continue" button and complete Atlas' account-creation process. *Id.* ¶ 7.f.xi.

After checking all three boxes, Plaintiff clicked the "Continue" button, completed Atlas' account-creation process, and confirmed his agreement to Atlas' Terms, including the Arbitration Agreement. *Id.* ¶ 8.d.

## B. Plaintiff's Allegations Against Atlas

Plaintiff filed his Complaint on March 18, 2025. Despite consenting multiple times to receive Atlas' text messages *and* confirming that his phone number was correct, Plaintiff alleges that he "received at least 12 telemarketing texts from" Atlas for which he allegedly "never provided his consent." Compl. ¶¶ 26, 39. Plaintiff alleges those texts promoted Atlas' "credit card services." *Id.* ¶ 28. Plaintiff alleges that the telephone number he voluntarily provided to Atlas was registered on the National Do Not Call Registry ("NDNCR") when he received the text messages from Atlas. *Id.* ¶ 22. Plaintiff alleges that some of the text messages were sent before 8:00 AM. *Id.* ¶ 27. Plaintiff alleges that some of the text messages were sent after he texted Atlas the word "Remove" instead of the universally recognized "STOP." *Id.* ¶ 30. Those

allegations form the bases for the three TCPA claims Plaintiff asserts against Atlas under 47 C.F.R. §§ 64.1200(c)(1), (c)(2), and (d).

## III.  PLAINTIFF'S CLAIMS ARE SUBJECT TO BINDING ARBITRATION.

### A. The Court Should Issue an Order Compelling Arbitration.

The FAA provides that

> "[a] party aggrieved by the alleged failure . . . of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction . . . of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement."

9 U.S.C. § 4. Section 2 of the FAA mandates that binding arbitration agreements in contracts "evidencing a transaction involving commerce. . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision "reflect[s] both a 'liberal federal policy favoring arbitration' and the 'fundamental principle that arbitration is a matter of contract,'" such that "courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." *AT&T Mobility*, 563 U.S. 333, 339 (2011) (internal citations omitted); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) ("Section 2 [of the FAA] embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts[.]")."[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Id*. at 24-25.

Pursuant to the FAA, arbitration must be compelled where, as here: (1) "a valid arbitration agreement" exists; and (2) it "encompasses the" claims at issue. *See Robinson v. EOR-ARK, LLC*, 841 F.3d 781, 783-84 (8th Cir. 2016) (citation omitted). The party seeking to evade arbitration bears the burden of showing that the arbitration provision is invalid or does not encompass the claims at issue. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000).

### B. Plaintiff's Agreement to Atlas' Terms and Arbitration Agreement Through Atlas' Account-Creation Process is Valid Under California Law.

An arbitration agreement governed by the FAA is presumed to be valid and enforceable.[1] The Arbitration Agreement here is valid under applicable law and, thus, must be enforced as written.

Atlas' Terms are expressly governed by California law. *See* Payton Decl. Exhibit B, Terms at 16. Thus, while the FAA governs the enforceability of the Arbitration Agreement, California law governs whether a valid agreement to arbitrate exists. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."). The Arbitration Agreement is valid because Plaintiff had constructive notice of it and manifested his assent to it when he clicked the box stating he agreed to Atlas' Terms, and then clicked the "Continue" button.

---

[1] *See Shearson/Am. Express v. McMahon*, 482 U.S. 220, 226 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-27 (1985).

*See Oberstein v. Live Nation Entm't, Inc.*, 60 F.4th 505, 512-13 (9th Cir. 2023) ("To form a contract under California . . . law, there must be actual or constructive notice of the agreement and the parties must manifest mutual assent.").

Further, a "clickwrap agreement" is a common type of agreement entities use for obtaining consumer agreement to their online terms of service. *Id.* at 513. It typically involves a website that "presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Id.* (citation omitted). "Courts routinely find clickwrap agreements[] enforceable." *Id.*

Here, Atlas' process for having Plaintiff agree to its Terms online is an enforceable type of clickwrap agreement. Plaintiff had to first check a box that stated: "By clicking this box you agree to [Atlas'] Terms[.]" Payton Decl. ¶¶ 7.f.xi.1, 8.d. Atlas' Terms could be accessed by clicking the blue hyperlinked "Terms" link that was in the first line of his agreement, right next to the first box, which would bring the user to Atlas' Terms. *Id.* ¶ 7.f.xii. The Terms provided notice of the Arbitration Agreement on the first page. *Id.* Only after Plaintiff checked both the first box and second box, the "Continue" button became available for him to click, which Plaintiff had to click—and did—to finish Atlas' account-creation process. *Id.* ¶¶ 7.f.x, xii, 8.d; *see Houtchens v. Google LLC*, 649 F. Supp. 3d 933, 941-42 (N.D. Cal. Jan. 6, 2023) ("Courts have routinely found that [] a presentation" where a hyperlink to a company's terms of service is "presented in blue text in a sentence that otherwise uses gray text;" which is "next to the box a user must select to accept the terms; and the screen[] on which

[it] appear[s] [is] uncluttered[,]" provides "reasonably conspicuous notice of hyperlinked terms." (citing *Adibzadeh v. Best Buy*, Case No. 20-cv-06257-JSW, 2021 U.S. Dist. LEXIS 193421, at *16 (N.D. Cal. 2021))).  The language by the first box clearly put Plaintiff on notice of Atlas' Terms and that by checking that box he was agreeing to them. Plaintiff then manifested his assent to Atlas' Terms by checking the first box and then clicking the "Continue" button.

Atlas' *multi*-step process for acquiring Plaintiff's agreement to its Terms is similar to, and as or more conspicuous than, other online agreements that have been enforced under California law. *See, e.g., Oberstein*, 60 F.4th at 515-17 (affirming the district court's holding that the defendant's terms, including the terms' arbitration provision, "were valid and binding" under California law, which merely presented users "with a confirmation button above which text informs the user that, by clicking on this button, 'you agree to our Terms of Use[,]'" and the "'Terms of Use' hyperlink [wa]s written in bright blue font, distinguishing it from the surrounding text[,]" and by "clicking on the blue 'Terms of Use' text, users [were] transferred to a separate webpage containing the Terms, which contain[ed] an arbitration provision."); *Murphy v. Confirm ID, Inc.*, No. 2:24-cv-00527-TLN-JDP, 2025 U.S. Dist. LEXIS 33823, at *17-20 (E.D. Cal. Feb. 24, 2025) (finding the process for agreeing to the defendant's terms and arbitration agreement was valid under California law despite "the textual notice [being] printed in a gray font considerably smaller than the font used in the other sections of the sign-up screen, and the comparatively larger [and bolded] font used in all of the surrounding text, and large shaded box with large white text [that]

naturally direct[ed] the user's attention from the textual notice[,]" because the textual notice was not "placed in between larger, attention-grabbing buttons that prompt[ed] the user to take action[,]" and the link to the terms was "contrasted in blue text, while the remainder of the sentence [wa]s in gray text.") (citations and internal quotations omitted). Therefore, the Arbitration Agreement is valid under California law.

## C. Plaintiff's Claims Fall Squarely Within the Scope of The Arbitration Agreement.

Where the parties have a valid arbitration agreement, an "order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Mitsubishi Motors*, 473 U.S. at 626. Where the arbitration clause is broad, there is a heightened presumption of arbitrability: "[in] the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT&T Tech.*, 475 U.S. at 650 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584-85 (1960)).

Here, the Arbitration Agreement broadly encompasses "any and all disputes or claims that have arisen or may arise between [Plaintiff] and Atlas, whether arising out of or relating to these Terms[,] . . . [or] **any advertising**[.]" Terms at 17 (emphasis added). That language is broad enough to cover the disputes at issue here because Plaintiff's claims arose from Atlas allegedly advertising through text messages. *See*

Compl. ¶¶ 26, 29 (Plaintiff's claims arise from his alleged receipt of "at least 12 telemarketing texts from" Atlas promoting its "credit card services.").

Thus, Plaintiff's claims fall squarely within the Arbitration Agreement.

**D. The Action Must be Stayed Pending Arbitration.**

Section 3 of the FAA expressly provides that, where a valid arbitration agreement requires a dispute to be submitted to binding arbitration, the district court "shall . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]" 9 U.S.C. § 3. Because Plaintiff must be compelled to arbitrate his claims, the action should be stayed pending completion of arbitration.

**IV.    IN THE ALTERNATIVE, PLAINTIFF HAS NO PRIVATE RIGHT OF ACTION FOR HIS TEXT-MESSAGE CLAIMS IN ANY EVENT.**

Plaintiff's TCPA claims flow from the mistaken premises that (a) the Supreme Court has already held that the TCPA's references to phone "calls" also include "text messages," and that (b) he has a private right of action under the FCC's March 2024 addition of text messages to its call-time restriction, NDNCR-related, and internal do-not-call list rules, even though Congress tied Subsection 227(c)(5)'s private right of action to the regulations that the FCC had to promulgate by 1992, none of which involved text messages.  Thus, in the alternative to compelling Plaintiff's claims to arbitration, the Court should dismiss the Complaint with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**A. The Supreme Court Never Held That a Text Message is a "Call" Under the TPCA.**

Despite providing screenshots of the text messages which are the basis of Plaintiff's claims, Plaintiff interchangeably uses the words "texts" and "calls" in his

Complaint. *Cf.* Compl. ¶¶ 26, 29, 30 (specific allegations regarding text messages) *with Id.* ¶¶ 28, 45, 55, 66 (mischaracterizing the text messages at issue as "calls"). Plaintiff mistakenly claims that, "[u]nder the TCPA, as confirmed by the Supreme Court, text messages are 'calls' for purposes of the TCPA." *Id.* ¶ 21.

Plaintiff mischaracterizes *Campbell-Ewald*, where the Supreme Court decided whether a Rule 68 offer of judgment could moot a plaintiff's class claims.  The parties neither litigated nor disputed, and thus the Court never decided, that the FCC, and then the Ninth Circuit following the FCC's 2003 dictum, had impermissibly conflated a call with text message *for purposes of 47 U.S.C. § 227(b)* ("Subsection 227(b)"). *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of §227(b)(1)(A)(iii).").  The Supreme Court was simply reciting the historical facts and parties' stipulation concerning how the FCC and Ninth Circuit had expanded "call" under Subsection 227(b).  The Supreme Court made no holding on the issue, and said nothing about Subsection 227(c)—the only basis of Plaintiff's claims here.

The Supreme Court made this clear again in *Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021).  In reversing the Ninth Circuit's overly expansive interpretation of Congress's "automatic telephone dialing system" in Subsection 227(b), the Court made clear that it was not resolving whether the FCC and Ninth Circuit also improperly expanded Congress's use of the term "call." *Id.* at 400 n.2 ("Neither party disputes that the TCPA's prohibition [under Subsection 227(b) applicable to ATDS usage] also extends to sending unsolicited text messages. We therefore assume that

it does without considering or resolving that issue." (citing *Campbell-Ewald*, 577 U. S. at 156)).

Therefore, the Supreme Court gives Plaintiff no comfort here. This Court should find that Plaintiff's effort to support his text-message claim through a mistaken reference to a Supreme Court ruling is unsuccessful.

## B. The Regulatory Background of the Do-Not-Call Rules and the Scope of the 1991 Private Right of Action Under TCPA Subsection 227(c)

Unlike Subsection 227(b)—which regulates autodialed and prerecorded/artificial voice calls to cell phones, and confers *open* rulemaking authority on the FCC—Congress established an entirely different regulatory structure and private right of action in Subsection 227(c). As explained below, Plaintiff's Complaint alleges that Atlas violated a new FCC-interpretive rule that took effect in March 2024 for allegedly sending him an *unwanted text message* to *his cell phone number*. There is no private right of action for *that* claim under Subsection 227(c)(5). Congress's Subsections 227(b) and 227(c) accomplish two entirely different objects; they each give the FCC materially different statutory authority; and they each confer entirely different private rights of action for alleged violations of each subsection.

As for Subsection 227(c), when Congress passed the TCPA in 1991, it directed the FCC to initiate a rulemaking within 120 days of December 20, 1991 to address "residential telephone subscribers' [] rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Congress directed the FCC to consider establishing national "do not call" systems, and to "develop proposed regulations" that

it determined were "most effective and efficient to accomplish the purposes of this section."  47 U.S.C. §§ 227(c)(1)(A), (E).  Unlike the temporally open rulemaking authority that Congress granted the FCC in Subsection 227(b), Congress put a clear deadline on the FCC's Subsection 227(c) rulemaking authority: the FCC had to "conclude" its rulemaking under Subsection 227(c)(1) "[n]ot later than 9 months after December 20, 1991[.]"  47 U.S.C. § 227(c)(2); *cf.* 47 U.S.C. § 227(b)(2)(A)-(C) (granting the FCC authority to enact Subsection 227(b) rules with no deadline).  Congress also directed the FCC to consider whether it needed additional "authority to further restrict telephone solicitations," and *if so*, to "propose specific restrictions to Congress."  47 U.S.C. § 227(c)(1)(D).

In 1992, the FCC initiated—and concluded—a rulemaking pursuant to that time-limited grant of Congressional authority.[2]  For its Subsection 227(c) rules, it ordered companies making live telemarketing phone calls to comply with call-time restrictions, 47 C.F.R. § 64.1200(c)(1), and with what is known as the "internal do-not-call list" rule, under which companies must timely honor requests from a consumer not to make *further* live sales calls to him or her.  *See* 47 C.F.R. § 64.1200(d).

Congress—the only body that can create a private right of action[3]—conferred a private right of action in Subsection 227(c)(5) to any person who has " received more

---

[2] *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("1992 TCPA Order"), CC Docket No. 92-90, Report and Order, 7 FCC Rcd. 8752, ¶ 5 (1992).

[3] *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) (language in a regulation cannot "conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself.").

than one telephone **call** within any 12-month period by or on behalf of the same entity **in violation of the regulations prescribed under this subsection**." (emphasis added).  Again, the only regulations that the FCC prescribed under *that* subsection of the TCPA—Subsection 227(c), pursuant to the time-limited grant of Congressional authority that expired in 1992—were call-time restrictions and its internal do-not-call list rules applicable to actual telemarketing phone calls.  *See* 1992 TCPA Order, 7 FCC Rcd. 8752 at Appendix B.  Thus, under *Sandoval*, violations of *those* rules carry a Congressionally authorized private right of action.  But that is not Plaintiff's claim here.

Here, Plaintiff is seeking to sue under two later FCC orders, both issued many years after the FCC's 1992 regulations for which Congress did create a private right of action. The first was released on July 3, 2003, and addressed live telemarketing phone calls to numbers on the Federal Trade Commission's ("FTC") NDNCR.[4]  18 FCC Rcd. 14014 at Appendix A. The second was released on December 18, 2023, with the relevant rule taking effect on March 26, 2024; that FCC order expanded its interpretation of its 2003 NDNCR-related rules to include text messages. 38 FCC Rcd. 12247 ¶ 26.

But both of these FCC orders were issued long after the 1992 expiration of Congress's time-limited grant of authority to the FCC under the TCPA to create regulations for which a private cause of action would exist under Subsection 227(c)(5).

---

[4] *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2003 TCPA Order"), CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014 (2003).

Thus, neither order provides Plaintiff with a private right of action to bring a claim under Subsection 227(c)(5) for his alleged receipt of text messages that allegedly violated 47 C.F.R. §§ 64.1200(c)(1), (c)(2) or (d).

1. **The FCC's 2003 TCPA Order did Not Create any Private Right of Action Under Subsection 227(c).**

When Congress enacted the TCPA in 1991, it gave the FCC the authority, under Subsection 227(c), to establish "a single national database [for] compil[ing] a list of telephone numbers of residential subscribers who object to receiving telephone solicitations[.]" 47 U.S.C. § 227(c)(3). But Congress required the FCC, *if* it was going to establish such a database, to do so by September 20, 1992. *See* 47 U.S.C. § 227(c)(2). That was the *only* time Congress has ever granted the FCC authority to create a national do-not-call database, which would have had a corresponding private right of action. But the FCC chose *not* to create such a database by that 1992 deadline. *See* 1992 TCPA Order, 7 FCC Rcd. 8752 ¶ 14 (declining to create a national do-not-call database).

In its 2003 TCPA Order, the FCC promulgated rules relating to a national do-not-call database. But those rules were *not* issued pursuant to authority from Subsection 227(c) of the TCPA. Rather, the FCC adopted rules implementing the FTC's newly created NDNCR,[5] and enacted 47 C.F.R. § 64.1200(c)(2) to marry up its regulations with the FTC's, which Congress gave it time-limited authority to do in The Do-Not-Call Implementation Act ("2003 DNC Act"), Pub. L. No. 108-10, § 3, 117

---

[5] *See* Pub. L. No. 108-82, §1, 117 Stat. 1006 (2003) (Congress providing the FTC with authority "to implement and enforce a national do-not-call registry").

Stat. 557 (2003).[6] Thus, the FCC's 2003 NDNCR-related rules, including 47 C.F.R. § 64.1200(c)(2), were promulgated pursuant to the authority Congress temporarily granted the FCC in the 2003 DNC Act—not the TCPA-linked authority that expired in 1992 and could have had a related private right of action under Subsection 227(c). Accordingly, there is no Congressionally created private right of action under Section 227(c)(5) for violations of those 2003 NDNCR-related rules.[7]

### 2. The FCC's 2003 NDNCR-Related Rules Do Not Apply to Text Messages.

The FCC's 2003 TCPA Order makes clear that its new NDNCR-related rules do not apply to text messages. In that 2003 Order, the FCC also expanded its rules *under Subsection 227(b)* of the TCPA to equate (or conflate) "call" with "text message"; the statutory authority for that FCC conclusion is not at issue here, because this is not a Subsection 227(b) case. The FCC ruled that Congress's Subsection 227(b) proscription "encompasses both voice calls and **text calls** to wireless numbers

---

[6] *Id.* § 3 (Congress ordering the FCC, by September 7, 2003, to "issue a final rule" relating to the FTC's NDNCR after consulting and coordinating with the FTC "to maximize consistency with the rule promulgated by the [FTC] (16 C.F.R. § 310.4(b))."). In the 2003 DNC Act, Congress neither mentioned Subsection 227(c) generally, nor the FCC's expired grant of rulemaking authority in Subsections 227(c)(1)-(2) specifically.

[7] Congress and the FCC made clear that the FCC would enforce its new NDNCR-related rules in 47 C.F.R. § 64.1200(c)(2)—not that there would be a private right of action for a violation of that regulation. *See* 2003 DNC Act § 4(b)(5)-(6), 117 Stat. 558 (Congress required the FCC to submit annual reports of "*the enforcement activities of the [FCC]* pursuant to the [TCPA]" and a review of *the FCC's enforcement proceedings* under the TCPA) (emphasis added); *see also* 2003 TCPA Order, 18 FCC Rcd. 14014, ¶ 36 (the FCC explaining that *it* would presume wireless subscribers registered on the NDNCR to be "residential subscribers[,]" but recognizing the need for "further proof of the validity of that presumption should *we* need to take enforcement action.") (emphasis added).

including, for example, **short message service (SMS) calls**." 2003 TCPA Order ¶ 165 (emphasis added).[8]  Thus, in 2003 the FCC treated "call" and "SMS" as synonymous for purposes of *Subsection 227(b)* of the TCPA—i.e., calls to cell phones made with an 'automatic telephone dialing system' or artificial or prerecorded voice.

But in the very next paragraph, the FCC turned to its decision about the applicability of its new NDNCR-related rules to wireless numbers.  There, the FCC clearly held that those rules only apply to "**live**" telemarketing calls—the calls where a living human being calls you.  The FCC used the word "live" *five times* in explaining its new NDNCR-related regulations:

> Although the same economic and safety concerns apply to all telephone solicitation calls received by wireless subscribers, the Commission has determined not to prohibit all **live telephone solicitations to wireless numbers**. The national do-not-call database will allow for the registration of . . . telephone numbers for those subscribers who wish to avoid **live telemarketing calls**[.] . . . [] [S]ubscribers thus have a simple means of preventing most **live telemarketing calls** if they so desire. Moreover, relying on the do-not-call database to control **live telephone solicitations** recognizes that prohibiting such calls . . .

2003 TCPA Order ¶ 166 (emphasis added). The FCC's new NDNCR-related rules clearly only applied to "live" telemarketing phone calls, not text messages.

### 3. The FCC's 2023 TCPA Order did not Create a Private Right of Action Under Subsection 227(c) for Sales Text Messages.

Plaintiff's claim is about a *text message* to a *cell phone number* on the *NDNCR*. None of those elements are included in the FCC's 1992 regulations promulgated

---

[8] The FCC's only cited authority for that proposition was one of its own Orders, which merely defined what an "SMS" *is*. *Id*. ¶ 165 & n.606 (defining "SMS" and citing Section 6002(B) of the Omnibus Budget Reconciliation Act of 1993, 17 FCC Rcd. 12985, 13051 (2002), which does not mention the TCPA, or purport to regulate SMS).

under Subsection 227(c).  Again, FCC rules relating to **live** sales *calls* to cellular telephone numbers registered on the NDNCR were not addressed until the FCC's 2003 TCPA Order.  Then it took the FCC another twenty years, through its 2023 TCPA Order, to expand its 47 C.F.R. § 64.1200(c) and (d) rules to sales text messages, despite no new grant of statutory authority to do so.  *See generally In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2023 TCPA Order"), CG Docket No. 02-278, Second Report and Order, 38 FCC Rcd. 12247 (rel. Dec. 18, 2023) 89 Fed. Reg. 5098 (Jan. 26, 2024) (announcing March 26, 2024 effective date). The FCC acknowledged in its 2023 TCPA Order that, "[w]hile combating unwanted and illegal calls has long been one of the Commission's top consumer protection priorities, combating unwanted and illegal text messages is a comparatively new focus." 2023 TCPA Order ¶ 5.[9]  Thus, the FCC simply expanded its 2003 TCPA Order, and therefore could not possibly have issued that new rule under any existing statutory authority in 2023 tied to Congress's 1991 private right of action in Subsection 227(c)(5).

Whatever statutory authority the FCC had to adopt NDNCR-related rules in 2003, or to enlarge them to text messages in December 2023, it had no right in 2003 or 2023 to create new private rights of action under Subsection 227(c)(5). *Sandoval*, 532 U.S. at 291 (an agency regulation cannot "conjure up a private cause of action

---

[9] The FCC also acknowledged that, until then, it had only "interpreted 'call' <u>in section 227(b)(1)(A)</u> of the [TCPA] to include both voice calls and text messages." *Id.* ¶ 5 & n.8 (emphasis added). Thus, the FCC acknowledged that its 2023 TCPA Order was an entirely new rule for purposes of its call-time restriction, NDNCR-related, and internal do-not-call list rules.

that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself."). Again, Congress made clear that Subsection 227(c)(5)'s private right of action is for a "person who has received more than one [1992-regulation-violating] **telephone call** within any 12-month period[.]" As such, Plaintiff's claims that Atlas violated Sections 64.1200(c)(1), (c)(2), and (d) by sending him text messages carry no private rights of action.  Plaintiff's Complaint must be dismissed.

### C. Plaintiff Fails to Plausibly Plead His TCPA Claim.

Even if this Subsection 227(c)(5) case was about live sales calls, Plaintiff must still plausibly allege that (1) he is a "*residential* telephone subscriber," and (2) he personally registered his telephone number on the NDNCR.  47 C.F.R. § 64.1200(c)(2) (emphasis added).  First, Plaintiff alleges only that his cellular telephone number is his "residential telephone number" and that it is not used for "business purposes." Compl. ¶¶ 22-24; *but see* Payton Decl. Exhibit C (Plaintiff's Federal Motor Carrier Safety Administration registration listing Plaintiff's phone number as his business number).  Plaintiff's perfunctory recitation of the statutory language is insufficient under Rule 8, *Iqbal,* and *Twombly*, and should be dismissed.  *See Hicks v. Alarm.com, Inc.*, No. 1:20-cv-532, 2020 U.S. Dist. LEXIS 157433, at *12 (E.D. Va. Aug. 6, 2020) (granting motion to dismiss where plaintiff alleged only that his cell phone was "not associated with a business and is for personal use").  Thus, judicially noticeable facts show that Plaintiff uses this cellular telephone number for commercial purposes.

Second, it is only a violation of Section 64.1200(c)(2) to initiate a telephone solicitation to "[a] residential telephone **subscriber who has registered his or her telephone number on the**" NDNCR. (emphasis added).  Plaintiff alleges only that his phone number "has been registered with the [NDNCR] since before 31 days prior to receiving the calls [*sic*]." Compl. ¶ 22. Plaintiff fails to plausibly allege that *he* personally registered that number on the NDNCR.  Thus, Plaintiff has failed to plausibly allege a violation of Section 64.1200(c)(2).  *See Rombough v. Robert D. Smith Ins. Agency, Inc.*, No. 22-CV-15-CJW-MAR, 2022 U.S. Dist. LEXIS 124614, at *11 (D. Iowa June 9, 2022) (dismissing Section 64.1200(c)(2) claim as the plaintiff failed to allege she personally registered her number on the NDNCR; holding that "a telephone subscriber who finds their telephone number already registered [on the NDNCR] cannot rely on that previous [subscriber's] registration for protection").

## D. Plaintiff's Count III Should be Dismissed For Failure to Plausibly Plead any Revocation of Consent

Plaintiff's Count III also fails because courts have long rejected TCPA plaintiffs' efforts to dance around the universally recognized "STOP" command to gin up a meritless TCPA revocation claim.  Here, Plaintiff clearly tried to avoid using the word "STOP" *even when* he was responding to a message that explicitly told him that he could opt out of Atlas' messages by just texting "STOP." Compl. ¶ 30.  Instead, he used the word, "remove." *Id*. Courts have rejected TCPA claims under the same types of circumstances.  *See, e.g., Rando v. Edible Arrangements Int'l, LLC*, Civil Action No. 17-701(JBS/AMD), 2018 U.S. Dist. LEXIS 51201, at *19-20 (D.N.J. Mar. 28, 2018) (dismissing TCPA claim where Plaintiff failed to follow the simple SMS instructions

to opt out by just texting "STOP," and reasoning that "a reasonable person seeking to revoke consent would have tried, at least at some point during the back-and-forth, simply replying 'STOP' to cancel--as instructed, rather than ignoring Defendant's revocation method and sending ten long text messages to that effect, most of which did not include the word 'stop' at all.").[10]

Further, the word "remove" is not a reasonable means to opt-out of Atlas' text messages.  In Plaintiff's cited 2024 FCC Order, Compl. ¶ 31,[11] the FCC modified its rules for how a called party can revoke his or her "prior express consent, including prior express written consent, to receive calls or text messages made pursuant to" 47 C.F.R. §§ 64.1200(a)(1), (a)(2), (a)(3), "by using any reasonable method to clearly express a desire not to receive further calls or text messages from the caller or sender." 2024 FCC Order at Appendix A. That rule took effect on April 11, 2025—after the messages at issue here—and is codified at 47 C.F.R. § 64.1200(a)(10).[12] But that rule change has nothing to do with Plaintiff's Subsection 227(c) case—and it

---

[10] *See also Epps v. Earth Fare, Inc.*, No. 16-8221, 2017 U.S. Dist. LEXIS 63439 (C.D. Cal. Feb. 27, 2017) (dismissing TCPA claim of plaintiff who intentionally avoided texting "STOP" and instead wrote narratives clearly avoiding the solicited "STOP"); *Viggiano v. Kohl's Dep't Stores, Inc.*, No. 17-0243-BRM-TJB, 2017 U.S. Dist. LEXIS 193999, at *10 (D.N.J. Nov. 27, 2017) ("the facts in the Complaint suggest Plaintiff[,] [instead of just replying 'STOP'][,] adopted a method of opting out that made it difficult or impossible for Defendant to honor her request[.]").

[11] *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* ("2024 FCC Order"), CG Docket No. 02-278, Report and Order and Further Notice of Proposed Rulemaking (February 15, 2024).

[12] *See In Re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, DA 25-315, Order ¶ 4 (April 7, 2025) ("[C]ompliance with the amendments and new rules set forth in the [2024 FCC Order]," including the new rule contained in 47 C.F.R. § 64.1200(a)(10), "is required as of April 11, 2025.").

didn't even apply to Subsection *227(b)* revocations until *after* the text messages at issue here.

Thus, Plaintiff should have followed the message's simple instructions and replied with the word "STOP" rather than "remove."  Under these circumstances, no viable TCPA claim exists.

## V.    CONCLUSION

Given Plaintiff's clear assent to Atlas' Arbitration Agreement, the Court should grant this Motion and order Plaintiff to arbitrate his dispute and stay the action pending completion of arbitration. If the Court does not order this case to arbitration, it should dismiss it with prejudice because Plaintiff lacks of a private right of action for these text-message claims in the first place.

<div style="margin-left: 40%">

Respectfully submitted,

Rodney P. Moore (96134)
P. Collins Hickman Jr. (2020189)
*Attorneys for Defendant, Exto Inc. d/b/a Atlas*
WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
Telephone: (501) 371-0808
E-mail: rpmoore@wlj.com;
chickman@wlj.com

</div>