# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

DERRANCE HARRIS, on behalf of himself and
others similarly situated,

        Plaintiff,

    vs.

EXTO, INC. d/b/a ATLAS

        Defendant.

Case No. 4:25-cv-00268-DPM

**Plaintiff's Response in Opposition To
Defendant's Motion To Compel/Stay and Motion To Dismiss**

## I.    INTRODUCTION

Defendant EXTO, INC. d/b/a ATLAS has filed a motion to compel arbitration based on a purported website visit that Mr. Harris never visited or submitted his information to. Because Mr. Harris did not agree to arbitrate his claims against ATLAS, its motion should be denied.

In the alternative, Defendant moves to dismiss this case on the basis that there is no claim under the TCPA for illegal text messages to Plaintiff's cell phone. As an initial matter, this motion is inconsistent with the Defendant's contention that the Plaintiff has (allegedly but falsely) agreed to submit his claims to an arbitral forum. Notwithstanding that inconsistency, in support of its motion to dismiss the Plaintiff's claims for blatant violations of the Telephone Consumer Protection Act's prohibitions against calling numbers on the National Do Not Call Registry, Defendant advances arguments that run contrary to the statutory text, Congressional intent, and a mountain of contrary case law. Similarly, courts in both the Eighth Circuit and elsewhere have likewise rejected Defendant's attempts to strike the class allegations here at the pleadings stage. Defendant's blatant attempt to gut almost 25 years' worth of TCPA § 227(c) Do Not Call Registry case law must be rejected.

## II.    BACKGROUND

This case concerns text messages that the Plaintiff never consented to and asked to stop, and which were therefore made in plain violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. (hereinafter referred to as the "TCPA") by the Defendant to market its credit card services. Defendant seeks to avoid this lawsuit by compelling arbitration based on the allegation that the Plaintiff submitted his telephone number on Atlas' website. In support of its motion to compel arbitration, Defendant has submitted supplementary materials, whereby it contends that someone named "Larvle Harris," not the Plaintiff, submitted their phone number and agreed to arbitrate their claims against ATLAS. But the website did not collect any of the

Plaintiff's information, and the Plaintiff has submitted a sworn declaration of his own stating that he never visited the website alleged, had no notice of any arbitration provision, and certainly did not agree to arbitrate any claims. In sum, Mr. Harris had no knowledge of, never agreed to, and would never agree to, arbitrate his claims against ATLAS.

This response follows.

### III.    LEGAL STANDARD

In evaluating a motion to compel arbitration in a TCPA case, the Federal Arbitration Act ('FAA'), 9 U.S.C. § 1 *et seq*., governs the enforceability of an arbitration agreement. That statute commands that before compelling arbitration of a dispute, the Court must first be satisfied that the parties agreed to arbitrate that dispute. 9 U.S.C. § 4 (directing that courts must direct the parties to arbitration "upon being satisfied that the making of the agreement for arbitration . . . is not in issue"). That issue is for the court, not the arbitrator, to decide, even when there is a valid delegation provision. *GP3 II, LLC v. Litong Cap., LLC*, 35 F.4th 1124, 1126 (8th Cir. 2022). When a motion to compel arbitration is brought by a party, courts must first determine whether the parties agreed to arbitrate, and, if so, then what their arbitration agreement covered. *BSI Grp. LLC v. EZBanc Corp*, 122 F.4th 712, 715 (8th Cir. 2024). If the record shows a "material issue of fact on whether the parties had an agreement to arbitrate," the issue must be remanded for jury trial under Section 4. *Id.* The party seeking to compel arbitration bears the burden of proving a valid agreement to arbitrate. *Ballou v. Asset Mktg. Servs., LLC*, 46 F.4th 844, 851 (8th Cir. 2022). It is only when the moving party meets that burden that the court will allow an arbitrator to determine scope. *JES Farms P'ship v. Indigo Ag Inc.,* 116 F.4th 733, 736 (8th Cir. 2024).

## IV.    ARGUMENT

*A.    There is no agreement to arbitrate because the Plaintiff has provided evidence showing that he never visited the website and thus never agreed to arbitrate. Defendant's own evidence does not even name the Plaintiff.*

"Arbitration is a matter of consent, not coercion." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 664 (2010). The Supreme Court has held time and time again that, despite the liberal policy favoring arbitration, "consent" remains a "first principle that underscores" all arbitration decisions. *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019). Consent is essential under the FAA because arbitrators wield only the authority they are given. *Id.* The Defendant is not entitled to invoke any arbitration clause against Mr. Harris because the factual question of whether the he even agreed as a matter of contract is called into issue, as Mr. Harris' declaration points out that he never visited ATLAS' website and the information ATLAS contends was submitted is simply incorrect information. Under Section 4 of the Federal Arbitration Act, a jury *must* decide this as a threshold to the threshold arbitrability matter, and jurisdiction lies with the Court on this issue, as confirmed by the Supreme Court in *Coinbase*, *infra*.

The Supreme Court recently addressed the proper procedure to follow when conflicts arise as to the enforceability of arbitration contracts. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 143 (2024). The Supreme Court held that the first question in any arbitration dispute must be what the parties agreed to. *Id.* at 145. The Supreme Court clarified that *this* "fundamental" question is one for the *court*, not the arbitrator, to decide, and is driven by contractual interpretation principles under state contract law. *Id.* In *Coinbase*, the Supreme Court reaffirmed that "where, as here, a challenge applies "equally" to the whole contract and to an arbitration or delegation provision, a *court* must address that challenge." *Id.* at 151 (*quoting Rent-A-Ctr., W., Inc. v. Jackson,* 561 U.S. 63, 71 (2010)). The Court went on to explain that in such cases, just like here,

3

"basic principles of contract and consent require that result. Arbitration and delegation agreements are simply contracts, and, normally, if a party says that a contract is invalid, the court must address that argument before deciding the merits of the contract dispute." *Id.* (quoting *Rent-A-Ctr.*, 561 U.S. at 71 for the proposition that "If a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that [arbitration] agreement."). And the explicit text of Section 4 makes it clear that formation is a *jury* issue, "upon such demand the court shall . . . specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed." 9 U.S.C. § 4. As such, a jury trial is necessary to ascertain if the Plaintiff himself submitted his information to ATLAS' website and thus agreed to arbitrate, as the evidence in support of this is disputed.

Consistent with the "general proposition" that "a contract cannot bind a non-party," *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 9 (1st Cir. 2014), "the FAA does not require parties to arbitrate when they have not agreed to do so," *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). The FAA commands that, before compelling arbitration of a dispute, the Court must first be satisfied that the parties agreed to arbitrate that dispute. 9 U.S.C. § 4; *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute."). And, "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

In both Arkansas and California, the party arguing the existence of a valid contract to arbitrate bears the burden of proving the contract existed and was formed, and that the *Plaintiff*

*himself* agreed to be bound by the clause. *Erwin-Keith, Inc. v. Stewart*, 546 S.W.3d 508, 513

(Ark. App. 2018); *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 915 (Cal. 1997). "A

threshold inquiry is whether an agreement to arbitrate exists; that is, whether there has been

mutual agreement, with notice as to the terms and subsequent assent." *Alltel Corp. v. Sumner*,

203 S.W.3d 77, 80 (Ark. 2005). The Court must "keep in mind two legal principles when

deciding whether a valid contract was entered into: (1) a court cannot make a contract for the

parties but can only construe and enforce the contract that they have made; and if there is no

meeting of the minds, there is no contract; and (2) it is well settled that in order to make a

contract there must be a meeting of the minds as to all terms, using objective

indicators." *Id.* "Both parties must manifest assent to the particular terms of the contract." *Id.*

Moreover, courts are also in agreement that the party seeking to compel arbitration must

demonstrate that the party had adequate notice of the arbitration provision. *See, e.g.*, *Robert D.

Mabe, Inc. v. OptumRX*, 43 F.4th 307, 329 (3d Cir. 2022) ("Because it is plausible that a number

of the pharmacies were never given the terms of their Provider Agreements, it is likewise

plausible that holding the pharmacies to the arbitration agreements contained therein would be

procedurally unconscionable."); *Klocek v. Gateway, Inc.*, 104 F. Supp. 2d 1332, 1335 n.1 (D.

Kan. 2000) (noting that Plaintiff had no notice of arbitration clause).

As the party seeking to arbitrate, the Defendantthus  bears the burden of demonstrating, at

the same level as at summary judgment, not only that a valid arbitration agreement exists but

also that the *Plaintiff himself* agreed to be bound by the clause. *See Campbell v. Gen. Dynamics

Gov't Sys. Corp.*, 407 F.3d 546, 552 (1st Cir. 2005). Defendant will be unable to do so because

the Plaintiff unequivocally denies ever having submitted his information to ATLAS' website.

*GP3 II, LLC v. Litong Cap., LLC*, 35 F.4th 1124, 1126 (8th Cir. 2022) (affirming denial of

motion to compel arbitration when the formation of the purported contract was called into question by an individual who denied he signed it). And Defendant has presented no additional information or evidence to show that Mr. Harris *himself* visited ATLAS' website or submitted any information at all. All the information the Defendant has is outlined below:

| Allegation | Truth |
|---|---|
| The name submitted on the website is "Larvle Harris." (ECF 8-1, p. 52). | The Plaintiff has never used that name and does not know anyone who has. Harris Dec. ¶ 18. |
| The Plaintiff submitted the opt in with a TCL T607DL phone. (ECF 8-1, p. 52). | The Plaintiff does not have that phone; he uses an iPhone, not an Android. Harris Dec. ¶ 17. |
| The Plaintiff's email is "COZPLUGN@gmail.com" (ECF 8-1, p. 52). | That is not the Plaintiff's email. Harris Dec. ¶ 14. |
| The "social network" through which the Plaintiff was "referred" to the Defendant's website was Instagram. (ECF 8-1, p. 52). | The Plaintiff has not used Instagram for years and no longer has access to his account. Harris Dec. ¶ 16. |
| The Plaintiff submitted the form on August 10, 2024 at 11:56:48 Zulu, which is 6:56:48 AM Central Time. (ECF 8-1, p. 52). | The Plaintiff would not have been awake at that time. Harris Dec. ¶ 15. |

As Abraham Lincoln once famously said, "a person surely knows where they reside just as they know their own name." Despite this, ATLAS incredulously claims to this Court that Mr. Harris doesn't know his own name, where he resided, or what phone and apps on the phone he used, as his Declaration makes clear, and yet agreed to somehow arbitrate any claims against Defendant. That the purported agreement originated from an IP address in Little Rock accounts for little; as this Court is aware, Little Rock is a big city and none of the other information proffered by the Defendant aligns with the Plaintiff submitting anything. At this stage, particularly as this case raises a factual challenge surrounding arbitrability, the Plaintiff is entitled to submit a declaration of his own in support of his position that he did not agree to arbitrate the dispute as an initial matter. *See Hesse v. Midland Credit Mgmt., Inc.*, No. 4:21-CV-00591-SEP, 2022 WL 503725, at *3 (E.D. Mo. Feb. 18, 2022).

To be clear, the Plaintiff unequivocally denies ever having agreed to arbitrate. On face, considering the Plaintiff's own above declaration and evidence, there exist issues with the evidence proffered by the Defendant, tending to show that the Plaintiff did not agree to arbitrate anything because he didn't even submit any of the incorrect information into ATLAS' website as an initial matter. The Plaintiff confirms these issues and independently verifies that he did not visit the website, had nothing to do with the visit, and thus did not agree to arbitrate anything. (Harris Dec. ¶ 9-12). These factual disputes doom ATLAS' assertion of arbitration and entitle Plaintiff to a summary arbitrational jury trial.

Despite the Defendant's faulty evidence which unequivocally demonstrates that it possesses no information that the Plaintiff himself, and not something like a bot farm,[1] submitted Plaintiff's information, and the Plaintiff's own denials, Defendant's motion is rife with the false and unsupported assertion that the "Plaintiff" submitted *his* phone number to the ATLAS website. But, under well-established TCPA and arbitration law, the Defendant must establish that the Plaintiff *himself*, and not someone else, agreed to arbitrate claims. *Starling v. OnProcess Tech., Inc.*, No. 1:23-CV-10949-JEK, 2024 WL 1258501, at *5 (D. Mass. Mar. 25, 2024) (denying motion to compel arbitration and holding non-signatory family member was not bound by arbitration agreement despite being listed as an alternate contact on account). It is also well

---

[1] What Plaintiff suspects occurred here is that the Plaintiff's information was submitted to Defendant's website using a phone bot farm. *See A Phone Bot Farm in Action*, REDDIT (June 28, 2024), https://www.reddit.com/r/Damnthatsinteresting/comments/1dqt70g [https://archive.is/ROelO]. Because companies like Defendant pay online advertisers per submission to drive traffic to their websites, advertisers use such "farms" using cheap prepaid cell phones like the TCL T607DL to artificially generate more website submissions and thus more profits in a process akin to artificially stuffing a ballot box. *Lead Gen Fraud: How to Identify and Prevent Fake Leads*, LUNIO (June 13, 2023), https://www.lunio.ai/blog/fake-lead-gen-fraud [https://archive.md/5k31J] ("Lead generation fraud is the use of bots to generate fake leads using misappropriated user data."); *Attribution Fraud*, HITPROBE, https://hitprobe.com/what-is-attribution-fraud [https://archive.md/qWebW].

established under the TCPA that consent is associated with the *called party* and *not* the *telephone number* at issue. *See, e.g., N. L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164, 1166 (9th Cir. 2020). As such, an intent to contact *someone else*, (possibly Larvle Harris, whoever that may be), who arguably consented to arbitrate, does not compel Mr. *Derrance* Harris to arbitrate claims to which he did not consent. *Id.* at 1167.

Several decisions in the TCPA context specifically dictate that the Defendant's motion ought to be denied on the basis of the Plaintiff's declaration *alone*. The Middle District of Georgia's decision in *Hobbs v. Apollo Interactive, Inc.*, No. 4:19-CV-57 (CDL), 2019 WL 6878863 (M.D. Ga. Dec. 17, 2019), is particularly instructive. There, a TCPA defendant sought to compel arbitration by contending, as here, that the plaintiff agreed to an arbitration provision as a result of his visits to the defendant's website. In finding no agreement to arbitrate existed based on inconsistencies in the purported website submission, the court explained:

> Plaintiff presented evidence that he "did not visit www.bestautoinsurance.com" and that it would have been impossible for him to access the website in the manner Defendant says he did. . . . Plaintiff stated that he "cannot know for certain who accessed" Defendant's website and input his information, but "[w]hat [he] do[es] know for certain is that [he] did not visit www.bestautoinsurance.com." From this, a reasonable factfinder could determine that Plaintiff did not enter his personal information on Defendant's website or click "submit." So, a reasonable factfinder could conclude that Plaintiff did not assent to the website's terms, including the arbitration provision. Accordingly, there is a genuine fact dispute as to whether Plaintiff entered an arbitration agreement with Defendant, and the Court thus cannot conclude as a matter of law at this stage in the proceedings that the parties had a valid agreement to arbitrate. For this reason, Defendant's motion to dismiss in favor of arbitration is denied.

*Id.* at *1-*2 (cleaned up). The *Hobbs* case is one of several in a long line of cases either denying such motions outright or ultimately concluding that a summary arbitration trial was necessary. *E.g.*, *Gilliam v. Prince Health Grp. LLC*, No. 1:24-CV-00033, 2025 WL 1126545, at *4 (M.D. Tenn. Apr. 16, 2025) ("[O]ther than the fact that Plaintiff's name and phone number were used, Prince Health offers no evidence that Plaintiff was the person who entered the information.");

*Woodard v. SmartMatch Ins. Agency, LLC*, No. 23 CV 5246, 2024 WL 4252803, at *3 (N.D. Ill. Sept. 20, 2024) ("Plaintiff's declaration is sufficient to satisfy her evidentiary burden at this stage of the litigation. . . . Because plaintiff has identified facts showing a genuine dispute as to her acceptance of defendant's arbitration agreement, defendant's motion to compel arbitration is denied without prejudice." and setting procedure for arbitration trial); *Kass v. PayPal, Inc.*, 75 F.4th 693, 704 (7th Cir. 2023) (when plaintiff declared that she never received an email with defendant's arbitration terms, she raised a triable issue of fact as to whether a valid arbitration agreement was formed); *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 789 (N.D. Ill. 2011) ("[T]he Court denies Defendants' joint motion to compel arbitration without prejudice because there is a genuine issue of material fact pertaining to whether Plaintiffs ever viewed the enrollment web pages containing the Terms and Conditions upon which Defendants rely.").

The Court in *Conrad v. Camping World Holdings Inc.* reached a similar conclusion, reasoning that the factual question of whether or not the plaintiff opted in to receive text messages from the defendant on a website containing an arbitration provision was put at issue and denied a similar motion to compel arbitration. No. 4:24-CV-171-CLM, 2025 WL 66689, at *2 (N.D. Ala. Jan. 9, 2025). There, the court first agreed that its decision "as to whether an arbitration agreement exists is simply a matter of contract," and that when a party does not "sign or otherwise enter the contract, he cannot be bound by its terms." *Id.* The court noted that the defendant provided no evidence to controvert the plaintiff's declaration, as here, that he did not agree to arbitrate any claims because he did not own the telephone number at issue at the time of the alleged opt-in, and thus that the defendant could not "show the parties had a meeting of the minds about arbitrating claims related to the CWH text message service." *Id.*

Accordingly, Defendant has and will be unable to meet its burden of demonstrating even

a genuine issue entitling the Plaintiff to wholesale denial of the motion. The court in *Conrad* did the same, holding as a matter of law that the defendant did not meet its burden of demonstrating a disputed factual issue with respect to the claimed provision to justify an arbitration trial. *Id.* And, like in *Hobbs*, the Plaintiff has made similar allegations of faulty arbitrational facts, including his physical location and other mismatched information. 2019 WL 6878863 at *1–*2. And because the Plaintiff agreed to nothing, he did not agree to arbitrate or receive calls.

   B. *There is also no agreement to arbitrate because it is legally defective.*

   The purported agreement to arbitrate based on alleged consent to contact the Plaintiff is legally defective and should not be enforced as a matter of law in any event because the website is insufficiently specific enough to put a website visitor on notice that they are agreeing to an arbitration clause. A review of the Defendant's motion confirms that the Plaintiff was asked to tick three boxes and one of no fewer than 10 links, spread across two sets of boxes, only one such link contains the allegedly subject arbitration clause. (ECF 8-1, p. 15).

   The hallmark of the enforceability of a clickwrap agreement is the conspicuousness of its notice. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30 (2d Cir. 2002). An offeree is "not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Id.* As numerous courts have held, burying the purported arbitration agreement under the "Terms" link on the page, which is buried among 9 other links across two sets of text boxes, is a game of hide-and-seek insufficient to give notice of the fact *this* link, as opposed to any one of the other 9 links *also* on the page, is the one which contains the arbitration provision. *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 765 (N.D. Cal. 2019) ("Users cannot be reasonably expected to click on every word of the sentence in case one of them is actually a link.").

Nothing in the language on the website gives notice to an ordinary consumer that the "link to "Terms" as opposed to the nine other links on the website, contain an agreement to arbitrate *at all*. The fact that the Defendant is attempting to compel arbitration based on a "gotcha" clause, is all the more obvious because the "Terms" link is simply buried upon the other links on the page. What's more, the "Terms" is a *PDF file* that a customer would need to *download and read*, thus disrupting the sign-up flow, particularly on a smartphone, where one would have to open the PDF reader app to read the terms and then switch back to the application itself in order to accept them. That is plainly insufficient under binding Ninth Circuit case law, which Defendant concedes applies to this analysis here.

In *Berman v. Freedom Financial Network, LLC*, the Ninth Circuit affirmed the denial of a motion to compel arbitration in a web form with far fewer maladies then here, but where the link had no "conspicuous notice" of the terms to which the consumer will be bound, nor did it "prominently display . . . proposed contractual terms," just like here. 30 F.4th, 849, 856–57 (9th Cir. 2022). It logically follows that, if one needs to open a separate app to view contractual terms contained in a PDF document and then return to the original app (like Instagram, as alleged here), to complete the sign-up process, that hardly qualifies as a "prominent" display of contractual terms. *Cf. Holdbrook Pediatric Dental, LLC v. Pro Computer Serv., LLC*, No. CIV. 14-6115 NLH/JS, 2015 WL 4476017, at *6 (D.N.J. July 21, 2015) (holding that a hyperlink to a PDF file, "without any statement to draw attention to the link, is insufficient to demonstrate that Holdbrook had "reasonable notice" that the "Terms and Conditions" were part of the contract."); *accord Starke v. SquareTrade, Inc.*, 913 F.3d 279, 284 (2d Cir. 2019) (link to PDF file containing warranty terms was insufficiently conspicuous).

This website in this case is remarkably similar, if not more problematic, than the one in *Arnaud v. Doctor's Assocs. Inc.*, 821 F. App'x 54, 56 (2d Cir. 2020), where the Second Circuit held that a disguised and cluttered link to terms and conditions was insufficient to give notice of a "clickwrap" arbitration provision. *Doctor's Assocs.*, *Berman, Holdbrook*, and *Starke* are four of many cases in the arbitration, TCPA, and consumer protection context where courts reject clickwrap agreements, particularly when their existence is buried, here among nine other links, or obscured, and when viewing the agreement requires a file download.

It is well established that clickwrap agreements only enforceable *when the nature of the link and its legal significance is pointed out to the consumer*. That is manifestly not the case here, where the link to the purported arbitration agreement is buried among nine others in a sea of links and requires a PDF download. Procedural and substantive conscionability is still a prerequisite to the enforcement of a clickwrap agreement, and such so-called "dark patterns" of hiding relevant contractual terms from consumers renders such clickwrap agreements unconscionable, and, by extension, unenforceable. This is not to mention the fact that, just like in *Rojas v. GoSmith, Inc.*, another TCPA case "Defendant did nothing that drew attention to [the arbitration provision] . . . [and] [n]o evidence shows any indication that Plaintiff was advised to read the entirety of the webpage." 2020 WL 831585, at *4 (N.D. Ind. Feb. 20, 2020). Other courts have followed similar reasoning. *See, e.g.*, *Walker v. Nautilus, Inc.*, 541 F. Supp. 3d 836, 841 (S.D. Ohio 2021) (holding that due to the inconspicuous nature of the website's terms of use, plaintiff had neither actual nor constructive notice of arbitration provision and therefore could not assent to it). This makes this case similar to *Schuchmann v. Great Am. Power LLC*, where the Middle District of Pennsylvania denied a motion to compel arbitration in a TCPA case when "the record as developed so far does not indicate that Plaintiff had been informed of the arbitration

clause," based on far less problematic website content than here. No. 3:23-CV-1604, 2024 WL 219267, at *4 (M.D. Pa. Jan. 19, 2024). As such, because the website did not draw notice to the arbitration provision or the link containing the PDF on the text of the purported submission page, in a sea of nine other identical links spread across two checkboxes, that provision is inconspicuous and unenforceable. Like in *Rojas*, *Schuchmann*, *Doctor's Assocs.*, and *Berman* nothing was said to Plaintiff or any website visitor to place a reasonable person on even inquiry notice that they are agreeing to binding arbitration.

Because any alleged agreement to arbitrate did not provide conspicuous notice of the arbitration provision, the Court must also deny the Defendant's motion on independent legal grounds, even if the Court were to hold, *arguendo*, that the Plaintiff agreed to arbitrate something as a factual matter.

C.    *The TCPA's Do Not Call Registry Provision applies to text messages to cell phones.*

Defendant argues that the Plaintiff's case should be dismissed because the TCPA's Do Not Call Registry provisions do not apply to text messages, and that the Supreme Court's *dicta* in *Campbell-Ewald* does not say what the Plaintiff says it does. This Court can easily dispatch that arguments, as countless others have.

"A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016). District and circuit courts around the country and this Court have had no trouble coming to the same inevitable conclusion. *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 356 (7th Cir. 2020); *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 986 (9th Cir. 2023); *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1223 (9th Cir. 2022); *Ford v. NaturaLawn of Am., Inc.*, No. CV 24-354 PJM, 2024 WL 3161762, at *6 (D. Md. June 25, 2024); *Cavey v. MarketPro Homebuyers, LLC*,

542 F. Supp. 3d 418, 424 (E.D. Va. 2021). Ignoring the Supreme Court's pronouncement in *Campbell-Ewald*, Defendant attempts to distinguish the statutory text (and the judgment of the Supreme Court) by reasoning that the definition of a "call" is different in subsection (b) as opposed to (c), or that the Supreme Court made no holding on the issue. There is no good reason why the definition of "call" ought to be treated any differently or to disregard the pronouncement of the Supreme Court, even *dicta*, directly relevant to the issue here.

As an initial matter, "A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012). "[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932). If the Supreme Court has stated that 47 U.S.C. § 227(b)'s prohibition against automated "calls" to cell phones applies to text messages, so too should 47 U.S.C. § 227(c), 47 C.F.R. § 64.1200(f)(15), (e), and (c)(2)'s prohibition of "calls" to cell phones on the Do Not Call Registry apply equally to text messages.

Defendant's attempts to substitute the rules of good statutory construction, the plain text of the statute, and Supreme Court precedent for some conflicting interpretation should be rejected, particularly as Defendant calls the kettle black in this regard, urging this Court to disregard good principals of statutory interpretation in other sections of its brief. Nearly every court to consider whether there exists a private right of action for text messages sent to cell phones on the do not call registry has concluded that there is such a right.

D.    *Section 227(c) of the TCPA provides a private right of action for calling a number on the Do Not Call Registry. The regulation sued under here was promulgated under Section 227(c).*

"The Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, she can add her number to the list. The TCPA then restricts the telephone solicitations that can be made to that number." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649 (4th Cir. 2019), *cert. denied*, *DISH Network L.L.C. v. Krakauer*, 140 S. Ct. 676 (2019). Ignoring the Fourth Circuit's counsel in *Krakauer*, which upheld the certification of a TCPA 227(c) class for calls to numbers on the National Do Not Call Registry, as here, Defendant here posits something remarkable: every court and the thousands of decisions to have considered the propriety of the TCPA's private right of action for calls to numbers on the National Do Not Call Registry all got it wrong, since the TCPA's authorization for creation of the National Do Not Call Registry (allegedly) expired in 1992 and was not adequately reinstated by any subsequent authority, including Congress's mandate in 2003. That approach is at odds with the plain statutory history, Congressional intent, and the text of the relevant provisions, and is further contradictory to the Defendant's own canons of construction.

Defendant's argument is at odds with the mountain of case law holding otherwise. As with any question of statutory interpretation, the court's inquiry "begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016). The relevant regulation here, 47 C.F.R. § 64.1200(c)(2), provides that "No person or entity shall initiate any telephone solicitation to: A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." As a federal regulation, this particular regulation must have been promulgated under *some* part of the TCPA. "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). In this regard, only a handful of

subsections of the TCPA allow for the promulgation of regulations:

      • § 227(b)(2) authorizes the FCC to implement requirements that relate to the use of prerecorded voices and automatic telephone dialing systems;
      • § 227(c) authorizes the FCC to promulgate rules relating to the "need to protect residential telephone subscribers' privacy rights";
      • § 227(d)(1)–(3) allow regulations relating to technical and procedural standards related to fax machines, automatic telephone dialing systems, and "systems that are used to transmit any artificial or prerecorded voice message";
      • § 227(e)(3) provides for regulations relating to misleading or inaccurate caller ID; and
      • § 227(i) allows for the FCC to promulgate regulations to streamline information sharing with the FCC related to violations

All but § 227(c) are quickly eliminated as not even remotely applicable to the creation of the Do Not Call Registry. As will be explained, it follows that the instant regulation must have been promulgated under § 227(c). As Defendant correctly observes, 47 C.F.R. § 64.1200 was initially promulgated by the FCC in 1992 and authorized by Congress when it passed the TCPA in 1991 under 47 U.S.C. § 227(c)(1), which required the FCC to conduct "rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights." Congress required the FCC to conclude *that* rulemaking proceeding "Not later than 9 months after December 20, 1991." 47 U.S.C. § 227(c)(2). And, in so doing, Congress explicitly authorized and mandated the FCC to consider whether it was feasible to "require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations." 47 U.S.C. § 227(c)(3).

Defendant claims that the FCC's failure to create the Do Not Call Registry in 1992, and Congress' failure to reference or otherwise reinstate its temporal authority under 47 U.S.C. § 227(c)(1) when it passed the Do Not Call Implementation Act in 2003, results in the lack of a private right of action to enforce the Do Not Call Registry because it was not promulgated under 47 U.S.C. § 227(c), but rather the 2003 Act. In other words, Defendant concedes that the Act properly created the Do Not Call Registry and incorporated it into the TCPA, but argues that,

without the proper "hook" back to 47 U.S.C. § 227(c) therein, there exists no private right of action to enforce the Registry's protections under that subsection. As support for that shaky proposition, Defendant reasons that the time requirement in 47 U.S.C. § 227(c)(1) *forever barred* future rulemaking and/or promulgation of additional regulations, rendering 47 C.F.R. § 64.1200(c)(2) unenforceable under 47 U.S.C. § 227(c)(5)'s private right of action for violations of the regulations prescribed "under" that subsection. However, the plain text of 47 U.S.C. § 227(c)(3) *does not* require the creation of a database by 1992, or "by" a certain date at all, contrary to Defendant's contention. 47 U.S.C. § 227(c)(3).

Defendant gets this threshold question wrong. A review of 47 U.S.C. § 227(c)(1)(D) confirms that Congress explicitly contemplated and authorized the FCC to "consider whether there is a need for *additional Commission authority* to further restrict telephone solicitations, including those calls exempted under subsection (a)(3) of this section, and, if such a finding is made and supported by the record, *propose specific restrictions to the Congress*." In other words, no part of 47 U.S.C. § 227(c) barred future rulemaking, as the Defendant claims. Congress was merely setting a date by which it desired *initial* rulemaking to be completed by, not barring *future* rulemaking after that date, and most certainly not in light of explicit Congressional authority authorizing such subsequent rulemaking in 15 U.S.C. § 6153. *See* Scalia & Garner 278 ("The one body whose future actions a legislature has no power to affect is the legislature itself. Just as a corporate board of directors cannot adopt an immutable policy, legislators cannot make their laws irrepealable or disable themselves or their successors from taking action."). To that end, Congress explicitly mandated the FCC to "consider whether making such practices mandatory, and imposing substantial sanctions for violations would increase their effectiveness to the point that they could satisfy the statutory requirements of this Act." House Report 102–

17

317, 102d Cong., 1st Sess. (1991) at 20. In other words, at the time it passed the TCPA, Congress made clear that the 1992 report it required was to be an *initial report*, not a *bar* to future rulemaking, as claimed by the Defendant. As the District of Maryland has observed:

> Subsection (c) also provided the FCC authority to 'require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase.' § 227(c)(3). The FCC did so when it created the national 'Do-Not-Call' registry. 47 C.F.R. § 64.1200(c)(2).

*Ford v. NaturaLawn of Am., Inc.*, No. CV 24-354 PJM, 2024 WL 3161762, at *3 (D. Md. June 25, 2024); *accord Cacho v. Amity One Debt Relief*, No. EP-24-CV-160-KC, 2024 WL 4594177, at *4 (W.D. Tex. Oct. 24, 2024). In any event, as will be discussed below, Congress explicitly authorized the promulgation of the regulation at issue here, "under the [TCPA,]" in 2003, when it passed the Do Not Call Implementation Act at 15 U.S.C. § 6153.

The FCC acted pursuant to Congress' mandate and, in so doing, explicitly made clear to Congress that it presumed to leave the door open to future rulemaking. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("1992 TCPA Order"), CC Docket No. 92-90, Report and Order, 7 FCC Rcd. 8752. In considering whether it was feasible to implement the Do Not Call Registry in 1992, the FCC concluded that, given the limitations of technology *at the time,* the database would be "costly and difficult to establish and maintain in a reasonably accurate form," including because of a lack of widespread caller ID adoption, and that implementation of a database at the time would result in shifted costs to consumers, which would ultimately detract from consumer protection efforts. *Id.* at 8760. Notably, in making such a determination, the FCC did *not* hold that a private right of action should not apply to such a database or that it was inappropriate from a consumer protection perspective. To the contrary, the FCC explicitly stated that a "consumer may also file suit . . . if he or she has received more than

18

one telephone call . . . *in violation of the guidelines* for making telephone solicitations." *Id.* at 8780. The FCC used the word "the," not "these," indicating that the guidelines promulgated in the 1992 TCPA Order were not the exclusive remedies under which a consumer could sue under Section 227(c)(5). There can be little doubt that that direction came from § 227(c).

Nor did the FCC's rulemaking close the door to the creation of a future database or future rulemaking to further the TCPA's mandate in crafting rules to protect consumer privacy. A statute is "alterable when the legislature shall please to alter it." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Indeed, the FCC explicitly made clear to Congress that it required "no further authority . . . at the present time to accomplish the goals of the TCPA." 1992 TCPA Order at 8781. And, in response to commenters who requested that the FCC start the rulemaking process anew, the Commission concluded that "at this time," the "renewal of the rulemaking process is not warranted," suggesting that the FCC retained the authority to continue rulemaking at a future time. *Id.* In fact, to this end, the FCC explicitly stated that "If our current approach is not successful . . . it may be necessary to initiate a rulemaking proceeding to establish more stringent restrictions, or even to recommend to Congress that it increase penalties or make other statutory changes." *Id.* at 8781-82. This explicitly mentions the possibility of future rulemaking, which could include revisiting the database method if the company-specific do-not-call lists promulgated under the act failed to meet consumer privacy needs. *See id.* at 8761.

But even if this Court were to adopt the Defendant's argument that Section 227(c)(1) in some manner restricted the FCC's ability to promulgate regulations to protect consumer privacy as an initial matter after the initial rulemaking in 1992, a proposition that conflicts with the presumption that "the TCPA is a remedial statute, it should be liberally construed", *Carlton v. PDR Network, LLC*, 80 F.4th 466, 479 (4th Cir. 2023), Congress explicitly reopened that door

when it passed the Do Not Call Implementation Act of 2003 ("2003 Act"). *See also Radvansky v. Kendo Holdings, Inc.*, 744 F. Supp. 3d 1314, 1321, 1321 n.3, n.4 (N.D. Ga. 2024) ("[T]he 2003 FCC order applies to section 227(c). . . .Therefore, Radvansky may bring a case [under (c)(2)].").

The Defendant's argument must additionally fail because, in the 2003 Act, at 15 U.S.C. § 6153, Congress *explicitly* delegated authority to the FCC to promulgate regulations relating to the newly-created National Do Not Call Registry "under the [TCPA]," and the FCC did so by initiating a rulemaking proceeding under subsection (c), the only appropriate subsection dealing with "consumer privacy." Congress explicitly passed the 2003 Act with a realization that the TCPA's then-current consumer privacy protections were inadequate. It is clear that, in Congress' directive to align the FTC and FCC's procedures, Congress intended for any subsequent rulemaking, including the FCC's 2003 TCPA Order, to provide a private right of action. Indeed, Congress explicitly stated that, "despite [internal do not call list and other] restrictions, telemarketing complaints continue to rise and there is an increasing need to provide consumers with the ability to opt-out of telemarketing calls." House Report 108–8, 108th Cong., 1st Sess. (2003) at 2-3. Accordingly, the Committee explicitly explained that:

> The FCC's do-not-call rules were created under the TCPA. *That statute explicitly gives the FCC the authority to set up a national do-not-call database.* In 1992, the FCC undertook a rulemaking, and after reviewing comments, determined that a national do-not-call list was too costly and burdensome at that time. The FCC instead opted to require telemarketers to maintain company-specific do-not-call lists. On September 12, 2002, the FCC issued a notice of proposed rulemaking to *review and possibly revise* its do-not-call rules. The comment period closed on January 31, 2003, and the FCC's Chief of Consumer and Governmental Affairs Bureau announced that the FCC's goal is to avoid regulatory duplication by working closely with the FTC and fashioning rules that benefit consumers and the telemarketing industry. As the FCC undertakes the process of revising its do-not-call regulations, there is the potential for inconsistencies between the FTC and FCC do-not-call rules. To address this issue, H.R. 395 directs the *FCC to complete its rulemaking within* 180 days of enactment and further requires the FCC to consult and coordinate with the FTC to maximize consistency between the two regulations. However, because the *FCC is bound by the TCPA*, it is impossible for the FCC to adopt rules identical to the FTC's TSR. . . . In order to remedy these types of inconsistencies, either

the FTC or FCC must address them administratively, or Congress must address them legislatively. We encourage the FTC and the FCC to take the necessary steps to make their rules as consistent and compatible as possible.

*Id.* at 4 (emphasis added). Consistent with the Committee's intent, Congress required the FCC to issue a "final rule pursuant to the rulemaking proceeding that it began on September 18, 2002, *under the Telephone Consumer Protection Act* (47 U.S.C. 227 et seq.)." 15 U.S.C. § 6153 (emphasis added). It further directed that, "In issuing such rule, the Federal Communications Commission shall consult and coordinate with the Federal Trade Commission to maximize consistency with the rule promulgated by the Federal Trade Commission." *Id.*

And under *that* Congressional mandate, the FCC promulgated the instant regulation, 47 C.F.R. § 64.1200(c)(2), pursuant to its authority *under* the TCPA, and pursuant to the *explicit authority* Congress in 2003 gave the FCC to conduct rulemaking *"under"* the TCPA. 15 U.S.C. § 6153; s*ee also Siringi v. Parkway Fam. Mazda/Kia*, No. CV H-23-1499, 2023 WL 7130867, at *2 (S.D. Tex. Oct. 30, 2023) ("The Federal Communications Commission promulgated 47 C.F.R. § 64.1200[(c)(2)] under its authority to implement the Telephone Consumer Protection Act."). The plain text of the 2003 Act, as well as the FCC's resultant rulemaking, cited below, belies the Defendant's contention that those rules "were not issued pursuant to authority from Subsection 227(c) the TCPA." The Act, by its plain text, does not permit for the promulgation of regulations *under the 2003 Act*, as claimed by Defendant, but rather *"under" the TCPA*. Under the ordinary meaning canon, Congress used the word "under" in the usual sense indicating derivation, subordination, or legal authority, rather than a looser association. Scalia & Garner 70. Thus, if the 2003 Act says "under the [TCPA,]" any regulation authorized thereunder must draw authority *from the TCPA*, not from any other related act, such as the Telemarketing Sales Rule or the 2003 Act itself, as Defendant claims. "[T]he meaning of a statute is to be looked for, not in any single section, but in all the parts together and in their relation to the end in view." *Id.* at 168.

Reading the 2003 Act as empowering regulations *under the TCPA* rather than *under the 2003 Act* (or under the Telemarketing Sales Rule) fits with how statutes, amendments, and administrative rulemaking works–the authorizing statute does not become the base statute or amendment, nor does the authorized rule. *See Alexander v. Sandoval*, 532 U.S. 275, 286, 291 (2001) (explaining genesis of a right of action). And it is the plain meaning evident from the text.

As outlined above, only a handful of subsections of the TCPA allow for the promulgation of regulations, and § 227(c) is the only appropriate one applicable here. The establishment of regulations "under the TCPA" for implementing the Do Not Call Registry has nothing to do with regulations concerning autodialers (§ 227(b)), fax machines and other systems used to transmit prerecorded messages (§ 227(d)), misleading or inaccurate caller ID ((§ 227(e)), or information sharing with the FCC ((§ 227(i)). Those regulations called for under the 2003 Act, however, fit nicely within the ambit of § 227(c), and only that subsection, which explicitly deals with the promulgation of regulations to "protect residential telephone subscribers' privacy rights." And, as explained above, Section 227(c), under which 47 C.F.R. § 64.1200(c)(2) was unquestionably promulgated, contains a private right of action.

In any event, the fact remains that the FCC stated that it promulgated the instant do not call regulations at 47 C.F.R. § 64.1200(c)(2) pursuant to authority Congress gave it in 15 U.S.C. § 6153, which authorized the FCC to promulgate the instant regulation "under" the TCPA at 227(c). *See Bowen*, 488 U.S. at 208. The *only* authority "under" which the FCC could promulgate regulations "under the [TCPA]" that supports the Congressional mandate is § 227(c), which provides for the instant private right of action to "protect residential subscribers' privacy rights to avoid receiving telephone solicitations to which they object." The FCC said so itself, confirming it was doing so pursuant to § 227(c). *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259,

1265 (11th Cir. 2019) (citing 47 C.F.R. § 64.1200(c)(2) and explaining that it was created pursuant to regulations promulgated by the FCC). Indeed, to adopt the Defendant's reading of 227(c) as time barred would render the mandate of the 2003 Act ineffective, in violation of the presumption against ineffectiveness, as there is simply no other statutory subsection "under the TCPA" upon which Congress could direct the FCC to promulgate the regulations it ordered to implement the Do Not Call Registry, the entire purpose of which is to permit consumers to *lodge their objections against unsolicited telemarketing calls*.

And, although not necessary to reaching the instant conclusion, the FCC's regulatory history confirms that the FCC promulgated 47 C.F.R. § 64.1200(c)(2) under its authority in § 227(c), as reconfirmed by Congress in 2003 when it passed the 2003 Act at 15 U.S.C. § 6153. Pursuant to that mandate, the FCC referred back to the discussion from above, and then it expressly sought comment on whether "network technologies have been developed over the last decade," to permit the implementation and incorporation of the Do Not Call Registry and other rulemaking. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2003 TCPA Order"), CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, 14118. And, as the FCC explained, it adopted 47 C.F.R. § 64.1200(c)(2) as a "second major proceeding" under the TCPA, as authorized by Congress, to "supplement the current company-specific do-not-call rules for those consumers who wish to continue requesting that particular companies not call them." *Id.* at 14017. It follows that, if the instant regulation "supplemented" regulations for which there was a private right of action in the first proceeding, the new regulations in the second proceeding, authorized by Congress, have that same private right of action as well. The FCC references Section 227(c) no fewer than 54 times, and not once does it state that its rulemaking authority was time-barred; to the contrary, in implementing the Registry mandate,

the FCC *cites* to Section 227(c)(3) of the TCPA as *explicitly* authorizing the use of a database and *confirms it is proceeding under that section*. *Id.* at 14028, 14034.

Of particular import against the Defendant's argument, in the 2003 Order, the FCC *explicitly stated* that it was promulgating what would become 47 C.F.R. § 64.1200(c)(2): "Pursuant to our *authority under section 227(c)*, we adopt a national do-not-call registry that will provide residential consumers with a one-step option to prohibit unwanted telephone solicitations." *Id.* at 14034 (emphasis added). The FCC also reviewed the "other requirements of section 227(c)(1)," which, as described above, impose no time-restrictive language by that subsection's explicit statutory text. *Id.* at 14042; 47 U.S.C. § 227(c)(1).

Defendant's argument that the 2003 Act or the 2003 TCPA Order needed to additionally explicitly outline that they were intended to be promulgated in spite of the 1991 rulemaking requirement runs contrary to the proposition that "there is no legal effect to a statutory provision stating that any exceptions to the statute's requirements . . . must specifically refer to the statute." *Scalia & Garner* 279. As explained above, it also runs contrary to the presumption against ineffectiveness. If the "language is susceptible of two constructions, one of which will carry out and the other defeat [its] manifest object, [the statute] should receive the former construction." *Id.* at 63. Relatedly, the "presumption of validity disfavors interpretations that would nullify the provision or the entire instrument, . . . since an interpretation that renders a provision invalid (unlawful) 'obstructs' its application to the maximum." *Id.* at 66. Defendant's contrary contention, that Congress required the FCC to create a database by 1992, or else forever bar future rulemaking, including the 2003 Act *passed by Congress* explicitly authorizing such rulemaking *under the TCPA*, runs contrary to these canons of construction and common sense.

Defendant's position begs the question as to why Congress would direct the FCC to

promulgate implementing regulations "under the [TCPA]" when it contends that Congress eliminated the FCC's authority to do so in 1992, or why Congress would do something it did not intend explicitly to do. Congress was clear when it directed the FCC to implement the newly-created Do Not Call Registry "under the [TCPA]." 15 U.S.C. § 6153. The FCC did so, promulgating 47 C.F.R. § 64.1200(c)(2) under the TCPA's consumer privacy provision, 47 U.S.C. 227(c), which contains a private right of action. As the regulation sued under here, 47 C.F.R. § 64.1200(c)(2), was promulgated under 47 U.S.C. 227(c). There exists a private right of action for violations of the same, as Congress intended under 47 U.S.C. 227(c)(5).

E.    *The TCPA provides a private right of action for text messages sent to numbers on the National Do Not Call Registry.*

As alluded to above, the TCPA's do not call registry provisions clearly apply to both calls and text messages. Again, start with the *explicit text* of the relevant regulations, which Congress explicitly authorized in 2003 when it passed the 2003 Act, 47 C.F.R. § 64.1200(c)(2), 47 C.F.R. § 64.1200(f)(15), and 47 C.F.R. § 64.1200(e), which states:

> The rules set forth in paragraph (c) and (d) of this section [i.e. including 47 C.F.R. § 64.1200(c)(2), sued under here] are applicable to any person or entity making telephone solicitations or telemarketing calls *or text messages to wireless telephone numbers* to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."

And nowhere in the 2003 TCPA Order or the statutory text does the FCC state that the regulations it promulgated under 64.1200 apply *only* or *exclusively* to "voice" calls. As one court noted, "[t]he statute does not specify that it must be a voice call or a live telephone solicitation or a live telemarketing call: it simply applies to telephone calls broadly. Because the FCC recognizes text calls as a type of call, a text message would presumably be a form of a telephone call under § 227(c)(5)." *Hudson v. Palm Beach Tan, Inc.*, No. 1:23CV486(WO)(JEP), 2024 WL 4190513, at *8 (M.D.N.C. Aug. 12, 2024).

But even if this Court were to conclude that a "call" under § 227(c) and 47 C.F.R. § 64.1200(f)(15) does not include text messages, Defendant ignores the plain text of the *regulation itself*, which prohibits making or initiating any "telephone solicitation" to a number on the Do Not Call Registry, and not just "calls." 47 C.F.R. § 64.1200(c)(2). Indeed, instead of looking at the 2003 FCC Order, the Court should first look to the text of the regulation itself, and that text is clear. What is a "telephone solicitation?" As the Seventh Circuit explained, also of relevance to the aforementioned discussion on appropriate promulgation:

> In enacting the TCPA, Congress granted the FCC statutory authority to create rules protecting consumers from unwanted "telephone solicitations." *See* 47 U.S.C. § 227(c). The FCC promulgated the regulations at issue here pursuant to its delegated authority and incorporated Congress's definition of "telephone solicitation" within them. 47 C.F.R. § 64.1200(f)(15).

*Hulce v. Zipongo Inc.*, 132 F.4th 493, 497 n.1 (7th Cir. 2025) (reasoning that a text message was a telephone solicitation but affirming dismissal on other grounds).

The term "telephone solicitation" is defined at 47 C.F.R. § 64.1200(f)(15) as the "initiation of a telephone call *or message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." By its plain text, then, 47 C.F.R. § 64.1200(c)(2) prohibits making a "telephone solicitation," which such term includes *either* a *call* or a *message*. If a text message is not a "call" under 47 C.F.R. § 64.1200(c)(2), it is surely a "message," and therefore still actionable. Numerous courts, including this one and others within the Eighth Circuit, as well as the Ninth, Eleventh, and Seventh Circuits, have agreed. *E.g.*, *Cross v. State Farm Mut. Auto. Ins. Co.*, No. 1:20-CV-01047, 2022 WL 193016, at *3 (W.D. Ark. Jan. 20, 2022) ("Although the TCPA itself does not specifically prohibit the use of an ATDS to send automated text messages, the FCC has used its rulemaking authority to apply the statute to text messages."); *Shears-Barnes v. Acurian, Inc.*, No. 4:20-CV-00161-LPR, 2021 WL 1201671, at *1

(E.D. Ark. Mar. 29, 2021) (holding that the TCPA is properly interpreted as applying to text messages); *Salcedo v. Hanna*, 936 F.3d 1162, 1166 (11th Cir. 2019); *Thompson v. Vintage Stock, Inc.*, No. 4:23-CV-00042-SRC, 2025 WL 385681, at *4 (E.D. Mo. Feb. 3, 2025); *Ford*, 2024 WL 3161762, at *6 ("At bottom, the TCPA permits a telephone consumer to sue a telemarketer if it can be shown that the consumer received more than one solicitation (whether by call or by text) within the preceding 12-month period in violation of the FCC's regulations governing such communications.").

When the FCC promulgated 47 C.F.R. § 64.1200(c)(2), pursuant to its Congressional mandate, in 2003, it did so also promulgating 47 C.F.R. § 64.1200(e), which itself confirms that 47 C.F.R. § 64.1200(c)(2) applies to cell phones. As the District of Maryland explained in *Ford*:

> Another regulatory provision clarifies that the kinds of calls prohibited in Section 64.1200(d), if made to a residential telephone number, are equally prohibited if made to a wireless telephone number. *Id.* § 64.1200(e). For more than a decade, courts and the FCC have understood the TCPA and its implementing regulations to limit marketing text messages sent to residential cell phone numbers as much as calls made to residential telephone numbers.

2024 WL 3161762, at *4. And, if there was any doubt as whether a text message can constitute a "telephone solicitation," it is clear that the FCC adopted a belt-and-suspenders approach to drafting, including both "calls" and "messages" in the definition, and explicitly extending the regulation to apply to cell phones.

Nor does the Plaintiff rely on *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2023 TCPA Order"), CG Docket No. 02-278, or its subsequent developments in alleging that the TCPA broadly prohibits sending text messages to cell phones. All the aforementioned provisions were present in the TCPA and CFRs in 2003 and before. The Defendant cites the 2023 Order and claims that it was this order that created a private right of action for text messages to cell phones. Not so. The 2023 Order explicitly stated that it was *not*

27

expanding the TCPA. Indeed, it stated that, "[T]he Commission and courts have long held that text messages are calls under the TCPA. . . . *[W]e are not expanding the National DNC Registry's restrictions*." 2023 TCPA Order at p. 26, ¶63 (emphasis added). At least two Courts have agreed. *Reimer v. Kohl's, Inc.*, No. 23-CV-597-JPS, 2023 WL 6161780, at *4 (E.D. Wis. Sept. 21, 2023) ("Against this backdrop, the Court is constrained to agree with Plaintiff that the Notice is a clarification and not a substantive change to the law."); *Pepper v. GVG Cap. LLC*, 677 F. Supp. 3d 638, 643 (S.D. Tex. 2023) (reasoning that because § 64.1200 references certain exceptions for text messages, it would be peculiar if § 64.1200(c) did not apply to texts).

In any event, the text is clear. The statute, 47 U.S.C. § 227(c)(5), imposes a private right of action for any violation of a regulation promulgated under that subsection. As explained above, 47 C.F.R. § 64.1200(c)(2) prohibits the initiation of a "telephone solicitation" to a telephone number on the National Do Not Call Registry. And 47 C.F.R. § 64.1200(f)(15) defines a telephone solicitation as either a *call* or a *message*. Just as well, well-established principles of statutory construction, as confirmed by Supreme Court precedent, dictate that a "call" includes a text message in other sections of the statute. That conclusion is confirmed by the statute itself, which confirms that subsection (c) applies to cell phones, and it is self-evident that a landline cannot receive a text message. 47 C.F.R. § 64.1200(e). But even if it didn't, there is no reason why a text message "call" should not alternatively be considered a "message" under that section. No reliance to external sources, 2023 FCC orders, other FCC rulemaking, or divination is required. The statute marks its own boundary. Defendant's theory has no legs.

F.    *The Do Not Call Registry applies to cell phones, and no pleading of personal registration is required.*

It is equally as clear that the provision sued under here, 47 C.F.R. § 64.1200(c)(2), applies to residential numbers, which include residential cell phones. Defendant's argument that

the Plaintiff's number is allegedly not residential based on extrinsic evidence this Court isn't even permitted to consider at the pleadings stage and which, if anything, shows that the number is arguably a dual-use number, should fail. Defendant's interpretation rests on a statutory interpretation that is "a bit strained as an initial matter." *Riley v. California*, 573 U.S. 373, 397 (2014). And yet again, as with any question of statutory interpretation, the Court's inquiry "begins with the text." *Ross*, 578 U.S. at 638. That analysis shows that cell phones assigned to residential services are plainly eligible for inclusion in the National Do Not Call Registry.

In enacting the Do Not Call provisions of the TCPA, the FCC chose to extend protection to "residential telephone subscribers." 47 C.F.R. § 64.1200(c)(2). Reading the term "residential" to exclude services, such as cellular services, used for personal, household purposes, as Plaintiff has pled here, is inconsistent with multiple canons of construction. Without a controlling statutory definition, as here, the term "residential" takes on its "ordinary . . . common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). And, under the fixed-meaning canon, "[w]ords must be given the meaning they had when the text was adopted." Scalia & Garner 78.

Importantly, in 2003 and continuing through present, the Code of Federal Regulations specifically relating to "Telecommunications" defined a "residential subscriber" as a "subscriber to a telephone exchange service that is not a business subscriber." *See* 47 C.F.R. § 64.2305(d). A "business subscriber" was defined as a "subscriber to a telephone exchange service for businesses." *See* 47 C.F.R. § 64.2305(b). Accordingly, "consumers" who subscribe to "telephone exchange services" are protected by the DNC Registry. "Businesses" who subscribe to "telephone exchange services" for businesses are not.

The Plaintiff has pled precisely that: that his number is "assigned to a telephone exchange service for consumers, and not a telephone exchange service for businesses." (Compl. ¶ 25). As a

result, Plaintiff sufficiently alleges that his telephone is a residential telephone. And since the

Court must view the complaint in the light most favorable to the plaintiff and accepting all well-

pleaded facts as true at the pleadings stage, disregarding extrinsic evidence at the same time,

Defendant's contention that Plaintiff cannot bring suit under 47 U.S.C. § 227(c) because the

alleged calls were made to some non-residential telephone fails as it is contradicted by the

*express factual allegations* in Plaintiff's class action complaint. *See, e.g.*, *Koeller v. Seemplicity*

*Sec. Inc.*, No. 4:24-CV-00528-SRC, 2024 WL 4751306, at *3 (E.D. Mo. Nov. 12, 2024)

("[plaintiff] alleges that he uses his cell phone for 'personal residential purposes…[this]

allegation is a factual one and in no way conclusory").

> Indeed, as the Middle District of Pennsylvania held last year:

> The best reading of the word "residential" is not that it modifies the "telephone," but rather that "residential" and "telephone" both modify the "subscriber." So instead of describing a "subscriber" who owns a "residential telephone," Section 227(c)(1) describes a "telephone subscriber" who has subscribed for "residential," i.e., personal, purposes. "Residential" is therefore used in the broader sense of "relating to a resident" to distinguish such a subscriber from a business or commercial telephone subscriber, who cannot be added to the Do Not Call registry.

*Jackson v. Direct Bldg. Supplies LLC*, No. 4:23-CV-01569, 2024 WL 184449, at *5 (M.D. Pa.

Jan. 17, 2024). For that matter, such a holding is entirely consistent with the statutory text

contained at 47 C.F.R. § 64.1200(e). The Fourth Circuit concluded the TCPA's language was

clear and that numbers on the Do Not Call Registry, including cellular telephones, are

"presumptively residential." *Krakauer*, 925 F.3d 657:

> The statute marks its own boundary. Suit can only be brought by those who receive multiple violative calls. Calls are only violative if the phone number was on the Do-Not-Call registry. And a number can only be placed on such a registry if the number is a residential line. Whatever work we may be required to do for more broadly worded statutes, Congress did the work for us here.

> Nor do the provisions of the TCPA require that one *personally register* their number on

the Do Not Call Registry because that fact would be *impossible to prove*, as the FTC is neither authorized to nor collects such information. For that matter, such a holding would also run afoul of the 2003 TCPA Order, which explicitly noted that "the only consumer information telemarketers and sellers will receive from the national registry is the registrant's telephone number. *This is the minimum amount of information that can be provided* to implement the national registry." 2003 TCPA Order at 14037 (emphasis added). Registering a telephone number on the Registry does not require the provision of any personally identifiable information, and requiring such information would defeat the purposes of registration, consumer privacy, as an initial matter. Thus, as an initial matter, the government is *not even authorized* to collect the information the Defendant claims the Plaintiff is required to prove as a legal matter. It follows that proving such information cannot be an element of a TCPA claim.

Relying on *Rombough v. Robert D. Smith Ins. Agency, Inc.*, No. 22-CV-15-CJW-MAR, 2022 WL 2713278, at *2 (N.D. Iowa June 9, 2022), the Defendant misstates the applicable law. The FCC's regulations permit a "residential telephone subscriber" to register "his or her telephone number" on the Registry. 47 C.F.R. § 64.1200(c)(2). Once a telephone number is registered on the Registry, the "registrations must be honored indefinitely, or until the registration is cancelled by the consumer of the telephone number is removed by the database administrator." *Id*. Previously, such registrations had to be renewed, but this hasn't been the case since at least the mid-2000s. Therefore, in addition to requiring the government to collect information it isn't even legally authorized to collect, *Rombough* purports to require some TCPA plaintiffs to do the impossible–personally *re*register a number already on the Registry. It has been disagreed with by every other court to consider it and its premises. *See, e.g.*, *Watson*, No. 20 CIV. 4572 (LGS), 2022 WL 4586407, at *9 (S.D.N.Y. Sept. 29, 2022) (holding that "whether

each class member registered their number on the NDNCR is irrelevant."); *Klassen v. Solid Quote LLC*, No. 23-CV-00318-GPG-NRN, 2023 WL 7544185, at \*4 (D. Colo. Nov. 14, 2023); *D.G. v. William W. Siegel & Assocs.,* 791 F. Supp. 2d 622, 625 (N.D. Ill. 2011) ("Plaintiff is the regular user and carrier of the phone, Plaintiff qualifies as a "called party" under the TCPA."); *Olney v. Progressive Cas. Ins. Co.*, 993 F. Supp. 2d 1220, 1225 (S.D. Cal. 2014) ("Defendant seeks to arbitrarily limit standing to only the individual whose name appears on the bill. Notably, Defendant does not cite a single case to support this position. Further, this position has been rejected by other courts.").

*Rombough* was most notably rejected in *Callier v. Am.-Amicable Life Ins. Co. of Texas,* No. EP-22-CV-00018-FM, 2022 WL 17732717, at \*5 (W.D. Tex. Oct. 18, 2022), where the Western District of Texas called the argument underlying the *Rombough* decision one that "borders on the frivolous." The *Callier* court went on to state:

> *Rombough's* nitpicky formality is thoroughly unpersuasive. The DNC is not auto-populated: it is a list of phone numbers for individuals who have requested that telemarketers not contact them. While it is possible a third-party may have registered a plaintiff's phone number before a plaintiff acquired it, this is unlikely given how infrequently people change numbers. And it is particularly unlikely here given Plaintiff's well-documented desire that telemarketers respect his registration with the DNC.

*Id.* at \*6 (cleaned up). As a result, there is no requirement that an individual personally register their number on the Do Not Call Registry and this Court need not even consider the issue when determining whether to strike the class allegations at the pleadings stage.

G.    *The Plaintiff adequately revoked any purported consent.*

The TCPA permits a consumer to revoke any purported consent to receive calls "at any time" and "through any reasonable means." *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, WC Docket No. 07-135, Declaratory Ruling and Order, 30 FCC Rcd 7961, 7993-99, paras. 55-70 (2015). As a result, a consumer

"may revoke his or her consent in any reasonable manner that clearly expresses his or her desire not to receive further calls, and that the consumer is not limited to using only a revocation method that the caller has established as one that it will accept." *Id.* at 7998-99, para 70. Defendant "may not abridge [Plaintiff's] right to revoke consent using any reasonable method," *id.* at 7996, para 64, and "may not deliberately design systems or operations in ways that make it difficult or impossible to effectuate revocations." *Id.* at 7961 para 64 n.233. Defendant's contention that texting the word "remove," as opposed to the word "stop," constitutes an ineffective revocation of consent, or that the Plaintiff was required to text "stop," and only "stop," borders on the frivolous and shows that the Defendant's system was deliberately designed to make it difficult or impossible to effectuate a revocation.

Indeed, most reasonable consumers, especially those who are older or less technically inclined, might respond to a text message in the decades-old traditional manner, by saying something to the effect of "Please remove me from your list," or something more terse, such as "remove me" or "remove," here. Regardless, the Plaintiff texted "Remove stop" and continued to receive messages. (Compl. ¶ 33). Since that message included the word "stop," and reasonable seller or system should have removed the Plaintiff's number, but did not. In any event, neither the Plaintiff nor anyone else receiving unsolicited messages should have to guess as to the precise and specific terms that a caller will or won't accept.

The contrary authority cited by the Defendant is distinguishable on this basis becaue in none of those cases did the plaintiffs plead a reasonable revocation of consent.

In *Epps*, for examplem the Court held that the following text messages were *per se* unreasonable and indicated that the plaintiff was bringing a "manufactured lawsuit:"

> (1) "I would appreciate [it] if we discontinue any further texts;" (2) "Thank you but I would like the text messages to stop can we make this happen;" (3) "I'm simply asking

for texts to stop. I would appreciate that. Thanks;" (4) "As I requested earlier I asked that the text would stop, I would greatly appreciate it. Thank you;" and (5) "I'm simply asking for texts to stop. I would appreciate that. Thanks."

As such, the Court concluded that "heeding Defendant's opt-out instruction would not have plausibly been more burdensome on Plaintiff than sending verbose requests to terminate the messages." No. CV1608221SJOSSX, 2017 WL 1424637, at *5 (C.D. Cal. Feb. 27, 2017). So too in *Rando*, where the Plaintiff sent "ten separate messages containing natural language stating her desire to stop receiving text messages" that was similarly *per se* unreasonable. *Rando v. Edible Arrangements Int'l, LLC*, 2018 U.S. Dist. LEXIS 51201 *3 (D.N.J. Mar. 28, 2018). But here, the Plaintiff did not send "verbose requests" of the same ilk as in *Rando*, *Epps*, or *Kohl's*. The Plaintiff did not take time to carefully craft long-winded, drawn-out sentences deliberately constructed to manufacture lawsuits by confusing automated systems. Rather, he simply did not pick the allegedly "right" word, and when he did, he combined it with the "wrong" word, thereby further negating his express and reasonable desire to be removed.

Nor is the Defendant's argument even appropriate at the pleadings stage, because any revocation was at least facially reasonable at the pleadings stage to require a jury to evaluate. In *Viggiano v. Lakeshore Equip. Co.*, the Court concluded that whether the defendant's refusal to parse sentence-based revocations of consent was "reasonable" as a factual determination that was "beyond the scope of a Rule 12(b)(6) motion because at this stage, the review is to determine if there is a plausible claim." No. 17-CV-00707 (PGS), 2018 WL 11310868, at *5 (D.N.J. Jan. 11, 2018). And, in that case, the Court noted that the Defendant's system would accept a variety of terms, including the word "remove" used here. *Id.* at *2. Thus, confusingly for consumers, the words programmed into a system to accept a revocation request will vary and often include such words as those the Plaintiff used, such as "remove." *See also Adam v. CHW Grp., Inc.*, No. 21-

34

CV-19-LRR, 2021 WL 7285905, at *2 (N.D. Iowa Sept. 9, 2021) (message stating "Send 'No' to be removed."); *W. Ry. Devices Corp. v. Lusida Rubber Prods., Inc.*, No. 06 C 0052, 2006 WL 1697119, at *4 (N.D. Ill. June 13, 2006) ("remove" number). That being the case here, a jury should decide whether the Plaintiff's four attempts to revoke any putative consent, by using the words "remove" and "remove stop," constitute "reasonable" means of removal, especially given that at least some text messaging systems *will* accept the word "remove."

## V.    CONCLUSION

This Court must deny Defendant's motion to dismiss in its entirety. Alternatively, it should permit the Plaintiff to amend to correct any deficiencies.

Dated: June 18, 2025              PLAINTIFF,
                                  By his attorney

                                  Andrew R. Perrong (333687)
                                  Perrong Law LLC
                                  2657 Mount Carmel Avenue
                                  Glenside, Pennsylvania 19038
                                  Phone: 215-225-5529 (CALL-LAW)
                                  Fax: 888-329-0305
                                  Email: a@perronglaw.com
                                  *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

On June 18, 2025, I electronically served the foregoing document on counsel of record for the Defendant.

                                  */s/ Andrew R. Perrong*
                                  Andrew R. Perrong