## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**DERRANCE HARRIS, on behalf of himself
and others similarly situated,**                                    **PLAINTIFF**

**VS.**                    **NO. 4:25-cv-00268-DPM**

**EXTO, INC. d/b/a ATLAS**                            **DEFENDANT**

## ATLAS' REPLY IN SUPPORT OF ITS
## MOTION TO STAY AND COMPEL ARBITRATION OR,
## IN THE ALTERNATIVE, TO DISMISS UNDER RULE 12(b)(6)

Exto Inc. d/b/a Atlas ("Atlas") respectfully files this Reply in support of its Motion to Stay and Compel Arbitration or in the Alternative, to Dismiss Under Rule 12(b)(6) ("Motion"), ECF No. 8, and supporting Memorandum ("Memo"), ECF No. 9.

Atlas submits this reply to underscore two points. First, there is a valid arbitration agreement between the parties. Atlas does not have the "wrong guy." Plaintiff's own court filings plainly contradict his declaration, in which he denies having agreed to Atlas' arbitration terms. Second, Plaintiff's TCPA claims fail as a matter of law because he has no private right of action under the relevant statutory and regulatory provisions. Therefore, this Court should compel Plaintiff's claims to arbitration or, alternatively, dismiss Plaintiff's claims with prejudice.

## I.    THE PARTIES ENTERED INTO AN ENFORCEABLE ARBITRATION AGREEMENT.

### A.    Plaintiff's self-serving affidavit should not preclude this Court from compelling his claims to arbitration.

Plaintiff attempts to avoid arbitration by submitting a declaration in which he claims he neither provided his contact information to Atlas nor agreed to its Terms of Service ("Terms"), which contain a valid arbitration agreement. But Plaintiff's declaration is entirely self-serving, unsupported by any corroborating evidence. Plaintiff's declaration also contains two material statements about him that are contradicted by his other court filings. First, Plaintiff claims that his "email is not and has not been cozplugn@gmail.com." Declaration of Derrance Harris, ECF No. 14-1, ¶ 14. Second, Plaintiff claims he does not "know anyone by the name of 'Larvle Harris' nor [has he] ever gone by that name." *Id.* ¶ 18. However, both of these assertions appear demonstrably false based on his own court records.

Specifically, Plaintiff has filed documents in other court cases where he represented his middle name as "Larvle," and his email address as cozplugn@gmail.com. *See* Exhibit A at 1, 5, and 11-12; *see* Exhibit B at 13, and 25; *see also* Declaration of Joseph P. Bowser authenticating Exhibits A, B, and C to the Reply.  In each of those cases, the email address that Plaintiff utilized for service and his filings match the email address submitted to Atlas—cozplugn@gmail.com. *See also* Payton Decl. at 21, ¶ 8.i (ECF No. 8-1) (confirming the dates on which Atlas' emails to Plaintiff's email address used on his various court filings were opened).  In Plaintiff's April 2023 filing to the United States Bankruptcy Court for the Eastern

District of Arkansas, made under penalty of perjury, Plaintiff stated that his name is "Derrance L Harris" and that he also uses the name "Derrance Larvle Harris." Exhibit A, at 1 and 5.[2]

Plaintiff also has been a party to a criminal case in which a "Larvle Harris" intervened to provide Plaintiff with a $100,000 indemnity bond. *See* Exhibit C. Larvle Harris there used the exact same address in Little Rock—the same location from which Atlas received the consent at issue in this case—that Plaintiff used in his other court filings. *Cf.* Exhibit A at 34 and 49, *with* Exhibit B at 13 and 25 and Exhibit C at 2-3.

Therefore, this is not a case of mistaken identity as to who agreed to the arbitration agreement. Plaintiff's previous court filings confirm that he was the one who agreed to arbitrate his claims with Atlas.[1]  Therefore, the Court should compel his claims to arbitration.[2]

---

[1] If the Court finds that Plaintiff's declaration is sufficient to raise a material issue of fact as to whether Atlas and Plaintiff formed an agreement to arbitrate, the Court should permit limited discovery on the issue of contract formation. But if the Court agrees with Atlas that the Declaration was improperly filed, Atlas should be reimbursed its fees therefor. *See Burnett v. Am. Int'l Indus.*, CASE NO. 3:20-CV-3046, 2022 U.S. Dist. LEXIS 15107, at *5 (W.D. Ark. Jan. 27, 2022) (a court, "in its discretion, [may] impose sanctions on attorneys, law firms, or parties who file pleadings containing factual contentions that lack evidentiary support and that are unlikely to have evidentiary support after a reasonable opportunity for further investigation or discovery." (citing *Jones v. UPS*, 460 F.3d 1004, 1008 (8th Cir. 2006))); *id.* (imposing sanctions where plaintiff's brief "contained representations that were either intentionally false or grossly misleading.").

[2] Plaintiff's declaration contains several other issues. For example, Plaintiff's declaration does not address the date of birth he submitted to Atlas, thereby confirming its accuracy. Plaintiff also claims he would not usually have been awake when his information was submitted to Atlas. Harris Decl. ¶ 15. But, unlike the *Hobbs* case he cites, that is not an unequivocal denial, supported by third-party

**B.    Atlas' Terms are enforceable as a matter of law.**

Plaintiff fails to provide any authority to support his claim that Atlas' process to secure consumers' agreement to its Terms is legally defective. *See* Opp. at 10-13. Plaintiff's argument fails for two reasons. First, Plaintiff did not address any of the cases Atlas cited to establish that its process is valid under California Law. *See* Memo. at 7-10 (explaining how Atlas' sign-up process is an enforceable clickwrap agreement). Second, Plaintiff relies on non-binding cases that involved distinguishable online-agreement-formation processes that are substantially less conspicuous than Atlas'.

Again, this is the page that Plaintiff and others viewed when proceeding through Atlas' account-creation process on its website, where the consumer had to agree to Atlas' Terms to continue:

---

evidence, that, at that date and time, Plaintiff was not in Little Rock, the location of the IP address associated his consent to Atlas' Terms. *Cf. Hobbs v. Apollo Interactive, Inc.*, No. 4:19-CV-57 (CDL), 2019 U.S. Dist. LEXIS 216357, at *4 (M.D. Ga. Dec. 17, 2019) (denying the defendant's motion to compel arbitration where the plaintiff submitted a declaration that included third-party evidence demonstrating that he was not at the location of the IP address, at the relevant date and time, associated with the submission of his information to the defendant).

11:18



# Accept terms & conditions

☑ By clicking this box you agree to our **Terms**, **Mobile Terms**, **Privacy Policy**, **Deposit Account Agreement**, **Deposit Account Rate and Fee Disclosure**, and **Academy Bank Privacy Policy**. The Deposit Account is provided to you on behalf of Academy Bank, NA, member FDIC.

☑ By clicking this box you agree to Atlas's payment partner, Dwolla's **Terms of Service** and **Privacy Policy**. Dwolla is a partner of Evolve Bank & Trust, member FDIC. By creating an account, you also agree to Evolve's **Customer Account Terms** and **Privacy Notice**.

☐ By clicking this box you agree to receive SMS alerts from Atlas. Message frequency varies. Message and data rates may apply. You can opt-out at any time by replying STOP, or text HELP for support.

**Continue**



🔒 app.new.atlasfin.com

*See* Payton Decl. ¶¶ 7.f.xi-xii. The "consumer had to check the first and second boxes to be able to click the 'Continue' button, which would take on the full-purple color once those two required boxes were checked." *Id*. ¶ 7.f.xi. The first bolded, highlighted, blue word by the first box is "Terms." *Id*. ¶ 7.f.xii. That word is a blue link that, when clicked, takes the consumer right to Atlas' Terms. *Id*. It certainly was not "buried," as Plaintiff claims. Opp. at 10.  Instead, the hyperlink to Atlas' Terms was sufficiently conspicuous to place Plaintiff on inquiry or constructive notice—it is the very first highlighted word after "you agree to our…". *See* Memo. at 7-10.

It is of no consequence that Atlas' entirely electronic process provided a hyperlink that, when clicked, brought the consumer to a separate PDF document. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 283-84, 295, n.12 (2d Cir. 2019) (noting that an irrelevant "'Warranty' hyperlink[,]" which "provided access to a two-page [PDF] document titled 'Terms & Conditions[,]'" likely did not provide "sufficient notice of" pre-sale terms and conditions as it was buried "amidst various other hyperlinks, banner advertisements, and customer reviews."). The court in *Starke* was not concerned that clicking the hyperlink brought a user to a separate PDF document containing terms and conditions.[3] Plaintiff's Opposition fails to show that Atlas'

---

[3] *See also Holdbrook Pediatric Dental, LLC v. Pro Computer Serv., LLC*, Civil No. 14-6115 (NLH/JS), 2015 U.S. Dist. LEXIS 94556, at *7-8, *17-18 (D.N.J. July 21, 2015) (finding issue with a terms hyperlink not because, when clicked, it opened a separate document containing terms and conditions, but because it was only accessible in the agreement's electronic form; further the agreement could not be accepted electronically, and lacked "a statement drawing attention to the separate" terms).

process failed to place Plaintiff on inquiry or constructive notice of Atlas' Terms and the arbitration clause contained in them.

Every case Plaintiff relies on is distinguishable from Atlas' online agreement sign-up process described above and in Atlas' Memo and supporting Declaration from Mr. Payton. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 20, 32 (2d Cir. 2002) (the terms notice was below the "defendants' invitation to download free software," and a user had to scroll "down the webpage to a screen located below the download button" to learn of the terms); *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 764-66 (N.D. Cal. 2019) (the first version of the sign-up screen at issue had a "hyperlink to" terms and conditions that "was not a different color, underlined, italicized, or in any way visually distinct from the surrounding text."); *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 854 (9th Cir. 2022) (finding the hyperlinks to the terms and conditions at issue to be defective because they were sandwiched between large buttons and within "two lines of text in a tiny gray font" and "appeared in the same gray font as the rest of the sentence, rather than in blue, the color typically used to signify the presence of a hyperlink," like that used in Atlas' here); *Arnaud v. Doctor's Assocs. Inc.*, 821 F. App'x 54, 56-57 (2d Cir. 2020) (finding the terms and conditions link at issue to be "insufficient to provide inquiry notice" where "the link was at the bottom of the page, in relatively small font, and was introduced by no language other than the shorthand 'T & Cs.'"); *Rojas v. Gosmith, Inc.,* CAUSE NO.: 2:17-CV-281-JVB-JEM, 2020 U.S. Dist. LEXIS 28922, at *4-5 (N.D. Ind. Feb. 20, 2020) (the box stating plaintiff "read and agreed to GoSmith's terms and its

privacy policy . . . was pre-checked, meaning that he was not required to take any affirmative action to indicate acceptance of the terms when creating his account," unlike Atlas' process here which requires affirmative consent by checking the box); *Walker v. Nautilus, Inc.*, 541 F. Supp. 3d 836, 841 (S.D. Ohio 2021) (the "'Terms of Use' hyperlink appear[ed] in small, faint gray letters at the bottom of the webpage— barely legible[,]" and users had "to scroll the equivalent of eight pages to reach" it); *Schuchmann v. Great Am. Power, LLC*, CIVIL ACTION NO. 3:23-cv-1604, 2024 U.S. Dist. LEXIS 10391, at *5, *7, *11 (M.D. Pa. Jan. 19, 2024) (plaintiff allegedly agreed to the defendant's contract during a phone call). Atlas' Motion should be granted.

## II.    ALTERNATIVELY, NO PRIVATE RIGHT OF ACTION EXISTS AND PLAINTIFF'S COMPLAINT MUST BE DISMISSED.

Plaintiff's Opposition spends nearly 25 pages trying to manufacture a cause of action that does not exist under the plain language of Subsection 227(c) of the TCPA and the FCC's regulations. Plaintiff's position ignores the fundamental principles of the United States Supreme Court's recent decisions in *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, No. 23-1226, 2025 U.S. LEXIS 2385 (June 20, 2025), and *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). In *McLaughlin*, the Supreme Court held that "[i]n civil enforcement proceedings under the [TCPA], [] district courts [are not] bound by the [FCC]'s interpretation of the" TCPA. 2025 U.S. LEXIS 2385, at *6. This Court must "independently "assess[] whether [the FCC]'s interpretation of the [TCPA] is correct[,] . . . [and] should interpret the TCPA under ordinary principles of statutory interpretation." *Id*. at *10. Further, with *Chevron* deference revoked, this Court must now exercise its "independent judgment [] in

deciding whether" the FCC "acted within its statutory authority" in its TCPA-related actions. Here, that concerns the FCC's 2023 expansion of its Do-Not-Call-related regulations ("DNC-related regulations"-47 C.F.R. §§ 64.1200(c)(1) (time-of-day restrictions), (c)(2) (the FCC's regulation relating to the National Do Not Call Registry ("NDNCR"), and (d) (the FCC's internal do-not-call requests regulation))— to text messages. *Loper Bright*, 603 U.S. at 412; *see also West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (agencies "have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'") (cleaned up).

As explained in greater detail in Atlas' opening Memo, to establish a private right of action under TCPA Subsection 227(c)(5), Plaintiff needs to show that he "received more than one telephone call within any 12-month period by or on behalf of the same entity **in violation of the [FCC's] regulations prescribed under this subsection[**.**]**" 47 U.S.C. § 227(c)(5). Thus, Plaintiff's private right of action must be directly linked to an FCC regulation—which exist only in the Code of Federal Regulations—that the agency prescribed under its Subsection 227(c) authority. Without *that*, this Court's Article III doors remain closed to him.

The FCC's *only* regulation on the subject of telephone-solicitation text messages to consumers—the object of Plaintiff's complaint—was issued in its 2023 TCPA Order.[4] That 2023 TCPA Order expanded 47 C.F.R. § 64.1200(e) to add the

---

[4] *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2023 TCPA Order"), CG Docket No. 02-278, Second Report and Order, 38 FCC Rcd. 12247 (rel. Dec. 18, 2023; effective on Mar. 26, 2024).

phrase "text message," for the first time.  But that 2023 TCPA Order could not have been promulgated under the FCC's long-expired statutory authority under Subsection 227(c). This Court need not decide if the FCC's 2023 TCPA Order had *some other* source of statutory authority outside Subsection 227(c); it need only decide that the FCC's long-expired Subsection 227(c) authority could not sustain the FCC's 2023 TCPA Order, such that Plaintiff is not suing under any "regulation prescribed under this subsection [227(c)]," and thus has no Congressionally authorized private right of action.

As explained below, Plaintiff's attempt to establish a private right of action here fails. Presumably knowing the FCC's 2023 TCPA Order does not sustain his claim, he does not even rely on it. *See* Opp. at 27. Instead, Plaintiff leans on decades-old statements that the FCC made about Subsection 227(b) robocalls—an entirely different subsection of the TCPA in which Congress gave the FCC open-ended rulemaking authority, unlike the time-limited authority it gave the FCC under Subsection 227(c). But this is not a robocall case under TCPA's Subsection 227(b), which governs an entirely different set of communications, gives the FCC open-ended rulemaking authority, and gives claimants a different private right of action. Plaintiff's effort to collapse the TCPA into a single, monolithic law ignores Congress's plain language in the TCPA.  This is a telephone-solicitation-call case under Subsection 227(c). Plaintiff needs to find an FCC regulation that the FCC promulgated under Subsection 227(c) and is applicable to text messages, which simply does not exist.  Without it, his Subsection 227(c) claims fail.

### A.    Plaintiff's reliance on irrelevant Subsection 227(b) authority does not afford a private right of action for text messages under TCPA's Subsection 227(c).

Plaintiff attempts to argue that Subsection 227(c)(5) of the TCPA, 47 U.S.C. § 227(c)(5), provides him a private right of action for offending text messages that violate any of the FCC's DNC-related regulations. But crucially, Plaintiff cites no authority supporting this conclusion.  Instead, Plaintiff relies on authority that is either about an irrelevant subsection of the TCPA (namely, 227(b)), or fails to address the scope of the private right of action under Subsection 227(c)(5). *See* Opp. at 13-15.[5] None of the cases Plaintiff cites hold that a text message qualifies as a "telephone

---

[5] None of these cases support Plaintiff's claim here. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) merely recited the parties' recognition of the FCC's 2003 interpretation that a "call" included "text messages" *for purposes of Subsection 227(b)* of the TCPA, 47 U.S.C. § 447(b), an FCC interpretation that is now clearly re-open to examination after *Loper Bright* and *McLaughlin Chiropractic Assocs. Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354 (7th Cir. 2020) was also a TCPA Subsection 227(b) case, and the Seventh Circuit affirmed the dismissal of that case because the Plaintiff's vicarious-liability allegations were deficient as a matter of law. *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983 (9th Cir. 2023) only addressed Article III standing issues when a mother received allegedly unwelcome messages that her son apparently solicited, and thus is irrelevant here. *Ford v. NaturaLawn of Am., Inc.*, Civil No. 24-354 PJM, 2024 U.S. Dist. LEXIS 111192 (D. Md. June 25, 2024) was clearly poorly briefed and/or decided, as the court there reached a number of inaccurate conclusions regarding basic historical facts about the legislative and regulatory history of the TCPA, including assuming, obviously incorrectly, that the FCC had already issued its expanded regulation applying its NDNCR-related regulations to text messages "more than a decade" before the 2024 case, even though that FCC regulation was of course only enacted in late 2023, effective in March 2024. *Cavey v. MarketPro Homebuyers, LLC*, 542 F. Supp. 3d 418, 424 (E.D. Va. 2021) isn't even a TCPA case, so has no bearing here. Finally, *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649 (4th Cir. 2019), *cert. denied, DISH Network L.L.C. v. Krakauer*, 140 S. Ct. 676 (2019) isn't a text message case. It is only by mischaracterizing case law that Plaintiff could claim that Atlas is the one "at odds with the mountain of case law holding otherwise."  Opp. at 15.

solicitation" "call" under Subsection 227(c) of the TCPA, for which Congress created a private right of action under Subsection 227(c)(5).

Plaintiff also claims Atlas is "[i]gnoring the Supreme Court's pronouncement in *Campbell-Ewald*." Opp. at 14. This is wrong. *See* Memo. at 12 ("Plaintiff mischaracterizes *Campbell-Ewald*, where the Supreme Court decided whether a Rule 68 offer of judgment could moot a plaintiff's class claims. The parties neither litigated nor disputed, and thus the Court never decided, that the FCC … had impermissibly conflated a call with text message *for purposes of 47 U.S.C. § 227(b)* ('Subsection 227(b)')"). The Supreme Court's dicta about the FCC's Subsection 227(b) position does no work for Plaintiff. He needs to find an FCC regulation relating to text messages that the FCC promulgated under Subsection 227(c), which does not exist.

Plaintiff's argument misses the mark entirely, devoting unhelpful attention to the irrelevant question of whether the Do-Not-Call Implementation Act ("2003 DNC Act") or the TCPA authorized the FCC's *2003* NDNCR-related regulations. *See* Opp. 18-25. But it is undisputed that the FCC's 2003 NDNCR-related regulations do not even address text messages.[6] Again, the FCC did not amend 47 C.F.R. § 64.1200(e)

---

[6] Plaintiff argues that the Court should ignore Congress's deadline to the FCC in Subsection 227(c)(1)-(2) because *the FCC* somehow told Congress in its 1992 TCPA Order that the FCC "presumed to leave the door open to future rulemaking." Opp. at 18. That is wrong: Congress creates statutory authority, not the agency. Congress *knows* how to give the FCC open-ended rulemaking authority. It did so in Subsection 227(b). The fact that Congress did not do the same in  Subsection 227(c), the very next subsection of the TCPA, cannot be ignored. Plaintiff also claims that "Congress made clear" that it only solicited an "initial report" from the FCC by its 1992 deadline. Opp. at 18. If it was so clear, one would expect to find the word "report" somewhere in Subsection 227(c). Alas, it is not there. Instead, Congress used words in

to make "text messages" subject to its rules in 64.1200(c) and (d) until its 2023 TCPA Order.  Plaintiff's discussion would be more germane if this case involved live phone calls.  But the question here is what gave life to the FCC's *text message* regulation applicable to telephone solicitations, which the FCC did not enact until December 2023, effective in March 2024, via its 2023 TCPA Order.  Neither the 2003 DNC Act nor the FCC's long-expired rulemaking authority under Subsection 227(c) gave the FCC *that* authority. And the FCC's own actions prove *that*: nowhere in its 2003 TCPA Order did it apply its new NDNCR-related regulations, or expand its then-existing DNC-related regulations, to text messages.  Rather, the FCC made clear that its NDNCR-related regulations only applied to "live" telephone solicitations, 2003 TCPA Order ¶ 166, *immediately after* it decided to treat a 'text message' as a 'call' solely for purposes of Subsection 227(b).  *Cf. id*. ¶ 165.

Disavowing reliance on the FCC's 2023 TCPA Order, Plaintiff mistakenly claims that the allegedly violated regulation regarding text messages sent to telephone numbers on the NDNCR, which he needs to state a proper claim, was silently on the books since at least 2003. *See* Opp. at 27 (claiming that the regulations he needed for a private right of action "were present in the TCPA and CFRs [sic] in 2003 and before").  Plaintiff asks this Court to read a Congressionally authorized regulation against text messages to numbers on the NDNCR into both the 1991 TCPA and then the FCC's 2003 DNC-related regulations applicable to *voice calls*. But the

---

Subsection 227(c) with settled meanings under the APA:  "rulemaking" and "regulation."

legislative and regulatory history show that (1) the FCC knew how to interpret calls to include "text messages" *for purposes of 227(b)* in its 2003 TCPA Order,[7] and did not reach that same result in the very next paragraph when it issued its NDNCR-related regulations; and (2) the FCC's 2003 NDNCR-related regulations only applied to "live" telephone solicitation calls, not text messages.

Put plainly, Plaintiff wants this Court to ignore and rewrite the TCPA, ignore and rewrite the legislative and regulatory history, and backdate the FCC's 2023 TCPA Order as if it had been issued in 1992 or perhaps 2003, so that he can have a text-message-related regulation promulgated under Subsection 227(c) to sue about. Under *Loper-Bright* and *McLaughlin*, this Court cannot do *that*.

## B. The FCC's 2023 TCPA Order was not promulgated under Subsection 227(c).

In its 2023 TCPA Order, the FCC's explanation for expanding its DNC-related rules to apply to text messages was simply that "it would be anomalous to conclude that text messages to wireless numbers are 'calls' for one part of the Commission's TCPA rules [i.e., those under Subsection 227(b)] but not for the DNC protections." *Id.* ¶ 27. Calling its own, 20-year regime "anomalous" cannot manufacture statutory authority out of whole cloth. But even if, post-*McLaughlin*, the FCC's decision to expand Congress's use of the word "call" to include "text messages" *for purposes of Subsection 227(b)* would survive judicial review, there are several important reasons

---

[7] *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2003 TCPA Order"), CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, ¶¶ 165-166 (2003).

the FCC could not use Subsection 227(c) to sustain its expanded DNC-related regulations to apply to text messages in its 2023 TCPA Order.

First, Congress used materially different language in Subsections 227(b) and 227(c) of the TCPA for the types of calls and services at issue. Subsection 227(b) is directed at so-called "robocalls"—autodialed and prerecorded/artificial voice calls—*to cell phones*. *See* 47 U.S.C. § 227(b)(1)(A). But in Subsection 227(c), Congress authorized the FCC to issue rules "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations [i.e., sales calls] to which they object." 47 U.S.C. § 227(c)(1). Thus, Subsection 227(b) is explicitly directed to robocalls to cell phones—devices that later could actually receive text messages— unlike the residential landlines receiving "telephone solicitations" at issue in 227(c) when Congress passed the TCPA in 1991. Again, text messaging was not even commercially available in 1991, *see* Memo. at 13, and the FCC's 1992 regulations promulgated under Subsection 227(c) predictably make no mention of them.

Second, the FCC has open-ended rulemaking authority under Subsection 227(b), but only long-expired rulemaking authority under Subsection 227(c)(2). *See* 47 U.S.C. § 227(c)(2) (the "Commission shall conclude" its Subsection 227(c) rulemaking by 1992); *id.* § 227(c)(1)(D) (if the FCC needs additional or future rulemaking authority regarding telephone solicitations, and "such a finding is made [by the FCC] and supported by the record, [the FCC shall] propose specific restrictions to the Congress"). Again, Congress needed to provide the FCC with *new statutory authority* to cause it to implement new NDNCR-related rules in 2003 and to expanded

its DNC-related regulations to apply to text messages in 2023. *See* Memo. 16-17. Thus, when the FCC declared in 2003, contrary to common usage and legislative history, that a "call" is somehow also a "text message" *for purposes of Subsection 227(b)*, *see* 2003 TCPA Order ¶ 165, it at least had open rulemaking authority under Subsection 227(b) (and the now-repealed *Chevron* doctrine). The FCC recognized it lacked any similar authority under 227(c) in its 2003 TCPA Order when it stated that its new NDNCR-related rules only apply to "live telemarketing calls" in the very next paragraph. 2003 TCPA Order ¶¶ 165-66. Thus, a lack of statutory authority under Subsection 227(c) also explains the FCC's own "anomalous" regulatory regime.

Third, unlike the FCC's long-expired statutory authority under Subsection 227(c), Congress has given the FCC statutory authority to regulate text messages in other, unrelated contexts since passing the TCPA in 1991. That Congress knows how to give the FCC additional statutory authority over text messages in other areas, *but did not* for Subsection 227(c), further undermines any claim that the FCC's 2023 TCPA Order was promulgated under Subsection 227(c). Congress added the term "text message" to the TCPA in 2018, but that was to Subsection (e), not Subsection (c).[8] Congress amended the TCPA again in 2019 via the TRACED Act,[9] but *again* did not give the FCC rulemaking authority over "text messages" in connection with

---

[8] Specifically, Congress added the term "text message" to the Truth in Caller ID Act, codified at 47 U.S.C. § 227(e), for which there is no private right of action, and which the FCC, Justice Department, and States enforce, 47 U.S.C. § 227(e)(5)-(6). *See* Consolidated Appropriations Act 2018, 115 Pub. L. No. 141.

[9] Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act, Pub. L. No. 116-105, 133 Stat. 3274 (2019) ("TRACED Act").

Subsection 227(c).[10]   Congress clearly knew how to address text messages, and chose not to re-open and expand the FCC's statutory authority under Subsection 227(c) to regulate text messages to numbers on the NDNCR.  The "anomalous" treatment of text messages in other subsections of the TCPA is clearly a feature—not a bug—of Congress's statutory framework. Thus, whatever statutory authority may support the FCC's 2023 TCPA Order, the only decision this Court must make here is that it is not grounded in the FCC's long-expired authority under Subsection 227(c).  Therefore, Plaintiff's 227(c) claims are not for violations of any regulations promulgated under the necessary subsection of the TCPA, i.e., 227(c).

## C. The TCPA's definition of "telephone solicitation" does not create his private right of action under Subsection 227(c).

Plaintiff next leans unhelpfully on the FCC's definition of "telephone solicitation," which simply repeats Congress's 1991 definition of that term in the TCPA, 47 U.S.C. § 227(a)(4).  *See* Opp. at 26.  This argument similarly misses the point: Subsection 227(c)(5)'s private right of action requires "more than one **call**" in violation of the regulations the FCC prescribed by its 1992 deadline. Thus, Plaintiff

---

[10] Section 10 of the TRACED Act added two new subsections to the TCPA.  New Subsection 227(i) required the FCC to prescribe new rules to streamline information-sharing about calls *or text messages* that violated Subsections 227(b) or 227(e) of the TCPA, and incorporated the definition of "text message" from the 2018 amendment referenced above.  New Subsection 227(j) directed the FCC to finish a Declaratory Ruling proceeding relating to carriers' robocall-blocking services, incorporating the same 2018 definition of "text message" for that too.  And, finally, Congress defined "robocall violation" in Section 11 of the TRACED Act as a "violation of subsection (b) or (e) of section 227 of the Communications Act of 1934."  Obviously, Subsection 227(c) was not mentioned there, and explicitly skipped over.

needs to establish that he received more than one "call" in violation of an FCC regulation promulgated under its Subsection 227(c) authority.

Second, when the FCC repeated Congress's definition of "telephone solicitation" in 1992 to include calls or messages, it was referring to sales-call messages left on one's residential answering machine. The FCC explained in its 1992 TCPA Order[11] that Congress's use of the term "message" referred to "voice messages." *Id.* ¶¶ 46-48; *see also Chris v. Tenet*, 57 F. Supp. 2d 330, 335 (E.D. Va. 1999) (recognizing that it is a "well-established canon of statutory construction that words have the same meaning throughout a given statute." (quoting *Baggett v. First Nat'l Bank of Gainsville*, 117 F.3d 1342, 1350 (11th Cir. 1997))).

Finally, Plaintiff's interpretation would wildly expand the scope of TCPA liability: by his logic, every advertisement one sees on their mobile phone—whether on a website or a social media application—would suddenly expose those parties to catastrophic TCPA liability because those ubiquitous advertisements are, of course, a "message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services[.]" 47 U.S.C. § 227(a)(4). Plaintiff's reliance on Congress's 1991 definition of "telephone solicitation" is misplaced.

Plaintiff has failed to cite any authority—much less any that would survive the examination required under *Loper-Bright* and *McLaughlin*—that the FCC established any regulation under the TCPA's Subsection 227(c) that gives rise to a

---

[11] *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("1992 TCPA Order"), CC Docket No. 92-90, Report and Order, 7 FCC Rcd. 8752 (1992).

private right of action for the receipt of unsolicited text messages. Courts must read and apply the law *as written*. Plaintiff's subjective beliefs have no textual support in the TCPA. This Court should dismiss his claim for want of a viable private right of action.

## III.    PLAINTIFF'S PLEADING DEFECTS ALSO REQUIRE DISMISSAL.

### A. Plaintiff fails to allege he personally registered his number on the NDNCR.

Plaintiff's 47 C.F.R. § 64.1200(c)(2) claim, Count II, also fails because he failed to allege that he personally registered his number on the NDNCR. In Section F of his brief, Plaintiff incorrectly argues there is no personal-registration element for a 47 C.F.R. § 64.1200(c)(2) claim. His argument improperly requires the Court to read language *out of* that FCC regulation. Plaintiff's interpretation, that it is a violation of 47 C.F.R. § 64.1200(c)(2) to text any telephone number registered on the NDNCR, regardless of whether the telephone number's subscriber was the person who actually did the registering, is not supported by that regulation's unambiguous language.

47 C.F.R. § 64.1200(c)(2) states as follows: "No person or entity shall initiate any telephone solicitation to . . . [a] residential telephone subscriber *who has registered his or her telephone number on the"* NDNCR. (emphasis added). Under that regulation's straightforward language, the suing plaintiff *must* be the person who "registered his or her telephone number" on the NDNCR. Plaintiff's improper interpretation requires this Court to rewrite that regulation, because, as indicated by his failure to allege it, *he* did not personally register his phone number on the NDNCR. As the court in *Rombough v. Robert D. Smith Ins. Agency, Inc.*, No. 22-CV-

15-CJW-MAR, 2022 U.S. Dist. LEXIS 124614, (N.D. Iowa June 9, 2022) correctly held, consistent with the Supreme Court's interpretive standards in *McLaughlin* and *Loper-Bright*, *that* is a necessary element of a 47 C.F.R. § 64.1200(c)(2) claim, which Plaintiff failed to plead. Thus, his 47 C.F.R. § 64.1200(c)(2) claim fails.

*Callier v. American-Amicable Life Ins. Co. of Texas,* EP-22-CV-00018-FM, 2022 U.S. Dist. LEXIS 228176 (W.D. Tex. Oct. 18, 2022) is the only case Plaintiff cites that addresses this issue, but the court erred. In *Callier*, the court called this plain-language reading "nitpicky," and then rewrote the FCC's language by suggesting that the FCC could not possibly have meant to write "who has registered his or her telephone number on the" NDNCR, because of "how infrequently people change [phone] numbers." *Id*. at *13-14. The court's reasoning is flawed. Many "millions of phone numbers are reassigned" *every year*. FCC Announces Pricing Changes, 2022 FCC LEXIS 1178, at *1 (Apr. 8, 2022). In fact, people change their phone numbers so often that the FCC has an entire system—called the "Reassigned Numbers Database," or RND—for callers to check which phone numbers have changed hands. *See* FCC, Reassigned Numbers Database, https://www.fcc.gov/reassigned-numbers-database (last visited June 26, 2025) (noting that since the FCC began collecting reassigned number reporting from carriers in 2021, it had received data on over 300 million reassigned numbers as of February 17, 2023). The court in *Callier* erred by ignoring the plain language of the regulation, and based its decision on a flawed factual assumption. Thus, Plaintiff has failed to cite any cases that validly

challenge the existence of the personal-registration element of a 47 C.F.R. §
64.1200(c)(2) claim.

### B. Plaintiff failed to make a reasonable do-not-call request to Atlas.

Plaintiff argues that his opt-out texts to Atlas were reasonable and therefore
his 47 C.F.R. § 64.1200(d) claim should survive. But, Plaintiff's argument ignores that
numerous courts have held that consumers fail to make reasonable do-not-call/texts
requests, for purposes of 47 C.F.R. § 64.1200(d), by failing to follow a defendant's
simple opt-out instructions, just as Plaintiff did here. *See* Memo. at 21-22. When a
company has a simple, "direct opt-out me[thod][,] such as . . . a reply of 'STOP' for
text messages[,]" and the consumer attempts to make opt-out requests that do not
follow that method, those requests are simply not reasonable, for purposes of 47
C.F.R. § 64.1200(d), as a matter of law. *See Epps v. Earth Fare, Inc.*, CV 16-08221
SJO (SSx), 2017 U.S. Dist. LEXIS 63439, at *11  (C.D. Cal. Feb, 27, 2017) (quoting
2015 TCPA Order ¶ 64); *see also* Memo. at 21-22. Plaintiff argues his efforts to opt
out should be deemed sufficient even though they were not compliant with Atlas'
simple opt-out method. *See* Opp. at 33-34. He just had to text "STOP."  Instead, by
texting words other than "stop" and not texting "stop" alone, Plaintiff "adopted a
method of opting out that made it difficult" for Atlas to honor his requests, thereby
rendering his opt-out requests unreasonable. *Viggiano v. Kohl's Dep't Stores, Inc.*,
Civ. Action No. 17-0243-BRM-TJB, 2017 U.S. Dist. LEXIS 193999, at *10 (D.N.J.

Nov. 27, 2017). Thus, his 47 C.F.R. § 64.1200(d) revocation claim should be dismissed.[12]

## IV. CONCLUSION

The Court should grant Atlas' Motion and order Plaintiff to arbitrate his dispute and stay the action pending completion of arbitration. Plaintiff's wholly discredited declaration does not preclude the relief sought by Atlas. If the Court denies the arbitration portion of Atlas' Motion, it should dismiss Plaintiff's Complaint with prejudice because Plaintiff lacks a private right of action for the text messages at issue.

Respectfully submitted,

Rodney P. Moore (96134)
P. Collins Hickman Jr. (2020189)
WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
Telephone: (501) 371-0808
E-mail: rpmoore@wlj.com;
chickman@wlj.com

and

---

[12] Plaintiff's other authority cited in this section is irrelevant. *See* Opp. at 34-35. The court in *Viggiano v. Lakeshore Equip. Co.*, Civil Action No.: 17-cv-00707 (PGS), 2018 U.S. Dist. LEXIS 243577, at *13 (D.N.J. Jan. 10, 2018) did not consider the defendant's opt-out method because it was explained in a declaration, which the court could not consider on the Rule 12(b)(6) motion. *Adam v. CHW Grp., Inc.*, No. 21-CV-19-LRR, 2021 U.S. Dist. LEXIS 170620 (N.D. Iowa Sept. 9, 2021) did not involve or address the reasonableness of the plaintiff's opt-out request. *W. Ry. Devices Corp. v. Lusida Rubber Prods.*, No. 06 C 0052, 2006 U.S. Dist. LEXIS 43867, at *11-15 (N.D. Ill. June 13, 2006) involved an irrelevant state claim about an allegedly oppressive fax sender.

Joseph P. Bowser (Admitted Pro Hac Vice)
ROTH JACKSON GIBBONS CONDLIN, PLC
1519 Summit Avenue, Suite 102
Richmond, Virginia 23230
Telephone: (804) 441-8701
E-mail: jbowser@rothjackson.com

*Attorneys for Defendant, Exto Inc. d/b/a Atlas*